[No. B151173. Second Dist., Div. Three. Jan. 31, 2003.]

LILLIAN L. COLORES, Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY
et al., Defendants and Appellants.

1294

1296

**COUNSEL**

Remer, DiVincenzo & Griffith and Joseph P. DiVincenzo for Plaintiff and Appellant.

Christine Helwick, LeRoy Anderson and Abraham C. Meltzer for Defendants and Appellants.

**OPINION**

**CROSKEY, Acting P. J.**—Plaintiff Lillian L. Colores appeals from a summary judgment in her suit for constructive wrongful discharge from employment at a state university. In granting summary judgment, the trial court ruled, as a matter of law, that the facts of this case cannot support plaintiff's allegation of constructive discharge. Defendants are the Board of Trustees of the California State University, James Rosser and Steven Garcia (the university, Rosser, Garcia, and, collectively, defendants). Rosser is the president of the university's Los Angeles campus. Garcia is the vice-president of administration and finance at that campus.

Although plaintiff alleged eight causes of action, our opinion concerns only a cause of action against the university for constructive wrongful termination in violation of public policy. The university's cross-appeal challenges an order that denied its first motion for summary adjudication of issues on that cause of action. The denial was based on the trial court's determination that an employee who takes a disability retirement from employment is not precluded from recovering on a wrongful constructive discharge cause of action.

The thrust of plaintiff's suit is that defendants targeted her for removal from employment because of her involvement in uncovering unlawful activities on the campus.[1] The suit alleges that plaintiff has a physical disability which is exacerbated by stress, that defendants intentionally made her job

---

[1]Fundamental public policy prohibits the retaliatory discharge of employees for whistle-blowing in the public interest. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 670-671 [254 Cal.Rptr. 211, 765 P.2d 373].) Labor Code section 1102.5, subdivision (b), prohibits

extremely stressful, and that they did this to accomplish their goal of causing her to leave her employment.

Using our independent judgment to review the rulings on the motions for summary judgment and summary adjudication, we find there are triable issues of material fact concerning whether plaintiff was constructively discharged, and we hold that plaintiff's disability retirement does not preclude her from claiming constructive discharge. Therefore, the university was not entitled to an adjudication on the fourth cause of action, for tortious constructive discharge in violation of public policy. We will therefore reverse the summary judgment and remand the case for further proceedings.[2]

## BACKGROUND OF THE CASE

### 1. The Operative Complaint

According to plaintiff's complaint, she worked for the university, from February 1977 to November 1998, in its office of administration and finance (the same department of which defendant Garcia is now vice-president). In 1986, about halfway through her employment, she was diagnosed as suffering from fibromyalgia, which she describes as "a disabling medical condition marked by chronic and debilitating pain and fatigue" which can be aggravated by stress. In 1993, the university created an "ADA" file for her (Americans with Disabilities Act). During her employment with the university, plaintiff's job performance was consistently rated as commendable to outstanding, she received progressive salary increases, and was a model employee, despite her disability.

employers from retaliating against employees for disclosing information to a government or law enforcement agency when the employee has reasonable cause to believe that such information discloses a violation of federal or state statutes or regulations. "This provision reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77 [78 Cal.Rptr.2d 16, 960 P.2d 1046].)

[2]Plaintiff also challenges an order that sustained defendants' demurrers to three of her causes of action. However, she has presented virtually no analysis in her appellate briefs to support her challenge. There is no presentation of the elements of the causes of action, and, correspondingly, no attempt to cite the facts alleged in her amended complaint that correspond to such elements. Nor does she cite to case or statutory authority. Her opening brief devotes a mere two pages to the demurrer issue, and her reply brief expends only one. She appears to invite us to examine the parties' trial court papers as a means of determining whether the court erred in sustaining defendants' demurrers. However, it is not appropriate to incorporate by reference, into a brief, points and authorities contained in trial court papers, even if such papers are made a part of the appellate record. (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 334 [4 Cal.Rptr.2d 897].) The dearth of true legal analysis in her appellate briefs amounts to a waiver of the demurrer issue and we treat it as such. (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 558-559 [45 Cal.Rptr.2d 117].)

Plaintiff began working at the university as a receptionist, and worked her way up to the position of director of procurement, contracts and support services, a position which she obtained in 1983 and remained in until July 1998, when she was forced to take a full-time medical leave of absence because the wrongful actions and omissions of the defendants caused her to become disabled from work. By November 1998, her medical condition had not improved sufficiently to enable her to return to work, and she applied for, and received, medical retirement with the university. Her condition has not improved and she remains unable to return to work. She was 49 years old when she filed this action.

Plaintiff alleges that defendant's wrongful acts against her began in July 1997, and were designed to harass her, defame her employment reputation, and create an abusive and hostile work environment, for the purpose of causing her an inordinate amount of stress, which would in turn exacerbate her medical condition to the extent that she would be forced to leave her job at the university, all of which was accomplished by defendants. Defendants Rosser's and Garcia's motivation was their desire to "protect and maintain self-serving and unlawful acts and practices within the administration of [the university]." These acts and practices consisted of misappropriating state funds, equipment, and services, by and through employees in the university's department of facilities operations. Defendants forced not only plaintiff but also two other women at the university out of their jobs. These women, Jacqueline Avery and Roshni Thomas, participated with plaintiff in the uncovering of such unlawful activities.

Between the time Garcia arrived at the university and plaintiff took medical leave, he directed numerous persons to document her for termination. They refused to do so because no cause existed to terminate plaintiff; however, with each new directive for documentation, plaintiff became more stressed and fearful for her job. Garcia also changed plaintiff's supervisor five times and stripped her of many of her responsibilities, doing so in a manner that demeaned and humiliated her and called into question her competence and honesty. After her doctor directed plaintiff to limit her work day to four hours, one supervisor began giving her work assignments that required far more than four hours per day to complete, and at defendants' instruction, directed her to process leases and other documents that violated university policy and the law, which she refused to do. Eventually, the stress of her work environment caused the chronic pain and fatigue associated with fibromyalgia to become highly exacerbated. Since July 1998, plaintiff's health has been in ruins, she is not likely to recover sufficiently to be able to return to work in a capacity similar to that which she held at the university, and she has been emotionally devastated by defendants' abusive treatment.

## 2. *Defendants' Demurrers and Motions for Summary Judgment*

Plaintiff alleged eight causes of action. As noted in footnote 2, *ante*, three were disposed of by demurrer. Four others were disposed of by defendants' first alternative motion for summary judgment or adjudication, and were not made an issue in this appeal. The sole remaining count is the one we address—plaintiff's fourth cause of action, against the university, for constructive tortious discharge in violation of public policy. The trial court determined that as a matter of law, plaintiff was not constructively discharged.

### ISSUES ON APPEAL

Plaintiff contends the question whether she was constructively discharged presents a triable issue of material fact and therefore the university cannot establish a complete defense to her cause of action for constructive tortious discharge in violation of public policy.[3]

The university raises the issue as to whether there can be a constructive discharge if the plaintiff-employee takes a disability retirement rather than simply resigning from her employment. The university contends that, under the laws governing the Public Employees' Retirement System, a disability retirement does not sever the employment relationship. Thus, the argument goes, disability retirement cannot support a claim of constructive discharge.[4] The university also contends that plaintiff's statutory tort claim was not timely filed with the state.

### DISCUSSION OF PLAINTIFF'S APPEAL

### 1. *Standard of Appellate Review*

We conduct a de novo review of the order granting the university a summary judgment. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 474 [261 Cal.Rptr. 735].) In doing so, we apply the same rules the trial court was required to apply in deciding the university's motion for summary judgment.

As the party moving for summary judgment, the university bore an initial burden of production of a prima facie showing that there is no triable

---

[3]Plaintiff also contends the university's second motion for summary judgment violated the letter and the spirit of Code of Civil Procedure section 437c, subdivision (f)(2). However, given our disposition of the other issues raised in this appeal, we need not and do not address that procedural issue.

[4]The statutes governing the Public Employees' Retirement System (PERS) are at Government Code section 20000 et seq.

issue of material fact in this case and it is entitled to judgment as a matter of law. Only if the university carried that burden was plaintiff faced with a burden of production of her own—to make a prima facie showing of the existence of a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.] No more is called for." (*Id.* at p. 851.)

■ "[G]enerally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . . Thus, a plaintiff bears the burden of persuasion that 'each element of' the 'cause of action' in question has been 'proved,' and hence that 'there is no defense' thereto. (Code Civ. Proc., § 437c, subd. (o)(1).) A defendant bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. (*Id.*, § 437c, subd. (o)(2).)" (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 850, italics and fns. omitted.)

■ "[H]ow the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial. [The California Supreme Court has] held to the effect that the placement and quantum of the burden of proof at trial [are] crucial for purposes of summary judgment. [Citation.] . . . Thus, if a plaintiff who would bear the burden of proof by a preponderance of evidence at trial moves for summary judgment, he must present evidence that would *require* a reasonable trier of fact to find any underlying material fact more likely than not—otherwise, he would not be entitled to judgment *as a matter of law*, but would have to present his evidence to a trier of fact. By contrast, if a defendant moves for summary judgment against such a plaintiff, he must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to a judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 851, fns. omitted.)

■ A defendant moving for summary judgment is not required "to conclusively negate an element of the plaintiff's cause of action. . . . [A]ll that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff

cannot prove element *X*. Although he remains free to do so, the defendant need not himself conclusively negate any such element—for example, himself prove *not X*. . . . The defendant has shown that the plaintiff cannot establish at least one element of the cause of action by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence[.]'" (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at pp. 853-854, fns. omitted.)

█ Because a summary judgment denies the adversary party a trial, it should be granted with caution. (*Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859, 865 [247 Cal.Rptr. 504].) Declarations of the moving party are strictly construed, those of the opposing party are liberally construed, and doubts as to whether a summary judgment should be granted must be resolved in favor of the opposing party. The court focuses on issue-finding; it does not resolve issues of fact.

### 2. The Doctrine of Constructive Discharge

█ "In an attempt to avoid liability [for wrongfully discharging an employee], an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted 'end runs' around wrongful discharge and other claims requiring employer-initiated terminations of employment. [¶] . . . [¶] Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation. [Citation.]" (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244-1245 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (*Turner*).)

"[T]he cases are in agreement that the standard by which a constructive discharge is determined is an objective one—the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' [Citations.]" (*Turner, supra*, 7 Cal.4th at p. 1248, fn. omitted.)

█ "In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign. [¶] For

purposes of this standard, the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Turner, supra,* 7 Cal.4th at p. 1251.)

 The length of time an employee remains on the job after the onset of the alleged intolerable conditions may be one factor in determining whether a reasonable person would find the conditions intolerable, but "[n]either logic nor precedent suggests it should always be dispositive." (*Turner, supra,* 7 Cal.4th at p. 1254.) "The mere existence of illegal conduct in a workplace does not, without more, render employment conditions intolerable to a reasonable employee." (*Ibid.*) Nor does a negative performance rating. (*Id.* at p. 1255.) "In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Id.* at p. 1247, fn. omitted.)

 "Standing alone, constructive discharge is neither a tort nor a breach of contract, but a doctrine that transforms what is ostensibly a resignation into a firing. Even after establishing *constructive* discharge, an employee must independently prove a breach of contract or tort in connection with employment termination in order to obtain damages for *wrongful discharge.* [Citation.] [¶] An employee may prove, for example, that a constructive discharge is a breach of an express or implied contract of employment. In the absence of an express or implied agreement to the contrary, an employment relationship without a fixed term is presumed to be validly terminable at the will of either party, employer or employee, at any time. [Citations.] However: 'In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including "the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged." ' [Citation.] [¶] Thus, a constructive discharge may, in particular circumstances, amount to breach of an employer's express or implied agreement not to terminate except in accordance with specified procedures or without good cause. [Citation.]" (*Turner, supra,* 7 Cal.4th at pp. 1251-1252.)

 "Apart from the terms of an express or implied employment contract, an employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision. [Citation.] An actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee. [Citations.]" (*Turner, supra,* 7 Cal.4th at p. 1252.)

"In order to sustain a claim of wrongful discharge in violation of fundamental public policy, [the plaintiff] must prove that his dismissal violated a policy that is (1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional provision. [Citation.] [¶] Tort claims for wrongful discharge typically arise when an employer retaliates against an employee for '(1) refusing to violate a statute. . . [,] (2) performing a statutory obligation . . . [,] (3) exercising a statutory right or privilege . . . [, or] (4) reporting an alleged violation of a statute of public importance.' [Citation.]" (*Turner, supra,* 7 Cal.4th at p. 1256, fns. omitted.)

In the instant case, the trial court granted the university's motion for summary adjudication of the fourth cause of action because it determined that "none of the matters characterized by plaintiff as intolerable, considered separately or collectively, creates a triable issue of fact. A reasonable person in plaintiff's position would not have felt compelled to resign, and plaintiff was not constructively discharged as a matter of law." We have reviewed the evidence submitted to the trial court, and we cannot agree that the question is so cut and dried.

### 3. *Plaintiff Presented Evidence That She Was Constructively Discharged*

We find there is much more substance to the evidence presented by the plaintiff than has been acknowledged by the trial court or the university. As we explain, we conclude that plaintiff's showing is sufficient to raise a triable issue as to whether a reasonable person, faced with the conditions under which plaintiff worked after defendant Garcia came to the university, would have felt compelled to resign.

#### a. *General Background of Plaintiff's Employment*

According to the evidence presented by plaintiff, she was an employee at the university for over 21 years, in its office of administration and finance, beginning as a receptionist in 1977. In 1983 she was named the director of one of the departments in that office—the department of procurement, contracts and support services. In July 1998, she took a full-time medical leave of absence because of her fibromyalgia. By November of that year, her condition had not improved enough to enable her to return, and she was approved for medical retirement. Plaintiff presented evidence that during the entire time she worked at the university, her performance reviews rated her commendable to outstanding, and she received progressive salary increases that were consistent with her excellent work. She had a reputation at the university for honesty and integrity, for being very competent, and for accomplishing difficult projects on time and under budget.

b. *Evidence Respecting Misappropriation of University Assets and the Women Who Uncovered the Misappropriation*

According to plaintiff's evidence, significant amounts of state funds and other assets were misappropriated for the benefit of university employees, by an Alfred Henderson, who was, for some time, the director of facilities operations, and also by some of the employees that Henderson supervised. (The department attends to custodial, construction and building maintenance.) Plaintiff presented evidence that these illegal acts were facilitated by the office of defendant president Rosser, "acting principally by and through . . . Rosser's personal assistant and personal friend, Ms. Rosie McNutt." The illegal activity included payment of overtime compensation to facilities operations staff for work not performed, or performed off-campus for the benefit of university employees; use or misappropriation of university equipment, inventories and supplies for non-campus-related work, performed for the benefit of university employees; and use of approximately $200,000 of funds slated for seismic retrofitting of university buildings but funneled instead for remodeling work on Rosser's office.

During 1996 and 1997, in the course of carrying out certain of her duties, plaintiff discovered evidence of such misappropriations and she informed Jacqueline Avery, her supervisor, of these matters. Avery was the interim vice president of administration and finance (the position that defendant Garcia later took over on a permanent basis). About this same time, Avery was investigating the facilities operations' budget deficit of approximately $300,000. Avery fired director Henderson in January 1997, and Roshni Thomas replaced him. Avery directed Thomas and plaintiff to establish a secured warehouse for facilities operations so that the university would have an established means of accounting for equipment, inventory and supplies, and be able to control vendor selection. According to plaintiff, many facilities operations employees were hostile to plaintiff and members of her staff and circumvented their policies and procedures.

c. *Evidence Concerning Defendant Garcia's Treatment of Plaintiff*

During the spring of 1997, Rosser hired defendant Garcia to replace Avery as vice president of administration and finance. One of the things that stands out in the evidence presented by plaintiff to the trial court is the dichotomy between (1) how plaintiff's job skills were characterized by her fellow workers and by her written evaluations, on the one hand, and (2) Garcia's apparently negative vision of her future at the university, on the other. From the evidence presented by plaintiff, a jury could reasonably conclude that her supervisors thought her performance was commendable and outstanding, and

although Garcia acknowledged (under oath) that he had no cause to terminate plaintiff, he nevertheless instructed person after person to document plaintiff for termination.

Jacqueline Avery was instructed to document plaintiff for termination, but she refused to do so. A woman by the name of Suzanne Curtis was told in her job interview with Garcia that her main task when she came to work at the university would be to document plaintiff for termination. This interview took place after Garcia had nearly six months to become acquainted with the high quality of plaintiff's work. We find significance in plaintiff's evidence reflecting that while Garcia repeatedly told Curtis that plaintiff was incompetent, he never gave Curtis any specifics regarding why he held that belief. As Curtis began to document plaintiff, she concluded that plaintiff was actually a very valuable and capable employee, and she went out of her way to convey that view to Garcia. Nevertheless, plaintiff's evidence suggests that Garcia remained focused on terminating her. Curtis described him as having a mean streak when it came to plaintiff. After Curtis left, Garcia continued to give instructions to others to document plaintiff for termination.

There is evidence that Garcia's apparently hostile attitude caused plaintiff no small amount of stress because she believed that Garcia was out to terminate her since people repeatedly told her so. Suzanne Curtis stated she saw "enormous stress" in plaintiff. William Gaffney, a human relations manager, stated he spoke with plaintiff about her being targeted for termination and found her distressed, confused about why things were happening, and worried about losing her job. Indeed, Gaffney apparently believed that all three women involved in investigating and uncovering corruption at the university and establishing the secured warehouse were targeted—plaintiff, Jacqueline Avery and Roshni Thomas. There is also evidence that within a short time after coming to the university, Garcia relieved all three woman of their duties respecting the secured warehouse, stripped Avery of many of her responsibilities, and fired Thomas even though she had just received an outstanding performance review. Avery became so distressed with her own working conditions that she quit in October 1997 and filed a claim against the university. It is reasonable to infer that the departure of these two women caused plaintiff stress.

Plaintiff was also faced with people trying to orchestrate problems for her. An Ellis Kirschenbaum told William Gaffney to falsify a memo to make it look like plaintiff had made a mistake on a contract. Then, at Garcia's request, Sri Renganathan, one of plaintiff's supervisors, made a demand to plaintiff that she process unlawful orders.

According to the evidence, Garcia not only engaged in a massive reorganization of the department that plaintiff oversaw, he reorganized it in a fashion that was disruptive of her position, duties, status, and reputation at the university. For example, Garcia never spoke with plaintiff first before transferring, to the oversight of the campus chief of police, half of the units in her department. Indeed, she was told, in front of the chief himself, that she would no longer oversee two of the units. Moreover, it was the chief, not Garcia, who told her she was losing a third unit, with the chief telling her he did not know why the change was occurring but he believed it had "something to do with an audit." There is evidence that Garcia posted notices on plaintiff's door to advise her she was being relieved of the management, which she said was *never* done by a supervisor at the university. There is no evidence that Garcia ever reassured plaintiff that her job performance was not the cause of the reorganization. Plaintiff related her feelings of humiliation at the implication that her duties were changed because she was dishonest and/or incompetent.

Garcia, for the most part, refused to talk to plaintiff about matters that related to her duties. However, he was accessible to others, even employees subordinate to plaintiff, thus refuting his assertion that he did not speak with employees who had a supervisor to whom they could speak. That added to her stress and feelings of isolation and humiliation. Additionally, between February and July 1998, Garcia placed plaintiff under the supervision of four different people, which also added to her stress. Plaintiff submitted evidence that the last of these supervisors, Sri Renganathan, gave her excessive and unnecessary assignments that were far in excess of what plaintiff could accomplish in the four hours per day her doctor had advised her to work.

Given the evidence of Garcia's stated determination to get rid of plaintiff, and his inability to find anyone that would document her for termination,[5] a reasonable inference could be drawn that the purpose of both his "reorganization" of plaintiff's work and the manner in which he accomplished the reorganization was to push plaintiff to quit her job. Her status as an ADA employee with a medical condition of fatigue and pain that worsens because of stress was information available to Garcia and would provide motivational evidence supporting a conclusion that he had a design to effect her termination. One could also infer that since he couldn't convince Avery, Curtis and others that plaintiff's record justified termination, he came up with a plan to make it *seem* like plaintiff's performance was of low quality, or even dishonest—and the plan was the reorganization of her duties and the excessive and unnecessary assignments given to her.

[5]Garcia testified at his deposition that it is not the practice of the university to terminate employees without cause.

As for Garcia's motives in trying to push plaintiff out, Suzanne Curtis stated he told her of his concern that plaintiff's friendship with Jacqueline Avery might pose problems if there were future issues with Avery, who had left the university. Curtis had the impression that Rosser was likewise concerned about plaintiff and Avery. William Gaffney stated Garcia believed plaintiff had too much power. According to Avery, Garcia told her he would not let anyone hold himself or Rosser hostage to information, which Avery took to mean the information she, plaintiff and Roshni Thomas had uncovered about misuses of university money and other assets, including Rosser's alleged misuse of university funds for his own office.

This evidence raises a triable issue as to whether a reasonable person, when faced with such working conditions, would find them so intolerable or aggravated that she would feel there was no reasonable alternative but to quit. Although the record reflects that Rosser stated to plaintiff that she would have a job at the university as long as he worked there, that remark compels no different conclusion. First, there is a triable issue that no reasonable employee would want to stay at the university under the conditions described in plaintiff's evidence. Moreover, given the evidence suggesting Rosser's alleged misuse of university funds, a jury could reasonably conclude that Rosser's remark was a veiled threat to the effect that, if plaintiff remained silent about alleged misconduct, and thus did not get him into trouble, she could keep her job.

4. *Plaintiff Presented Evidence She Was Constructively Discharged in Violation of Fundamental Public Policy*

As noted above, besides proving *constructive* discharge from employment, a plaintiff must also prove a tort or a breach of a contract, in connection with the termination, that entitles her to damages for *wrongful* discharge. (*Turner*, *supra*, 7 Cal.4th at p. 1251.) ▐ And, as noted earlier, a termination in contravention of a fundamental public policy expressed in a statute or constitutional provision can constitute a tort. (*Id.* at p. 1252.) To sustain a claim that she was discharged in violation of fundamental public policy, the plaintiff must prove the dismissal violated a policy that is fundamental, beneficial to the public, and embodied in a statute or constitutional provision, and such claims typically arise when an employer retaliates against the employee because she refused to violate a statute, performed a statutory obligation, exercised a statutory right or privilege, or reported an alleged violation of a statute of public importance. (*Id.* at p. 1256.)

Plaintiff's January 1999 tort claim that she filed with the State of California[6] alleged, among other things, that the university retaliated against her "in relation to 'whistle blowing' " and "directed her to commit illegal action."[7] The claim also makes reference to a letter plaintiff's attorney wrote to Rosser in August 1998. The letter alleges plaintiff and "her colleagues uncovered embezzlement, mishandling and misappropriation of public funds with implications reaching as far as your office [and thereafter plaintiff] and fellow whistleblowers have been the target of a vendetta to rid them from [the university]. These retaliatory actions against [plaintiff] have been orchestrated by your administration with Steve Garcia . . . as the henchman." Another portion of the letter speaks of plaintiff's "participation in the whistle blowing."

The university contends plaintiff cannot reasonably assert retaliation based on whistleblowing because she cannot be deemed to be a whistleblower since she did not report, to an outside government agency, to a law enforcement agency, or to the chancellor's office, wrongdoing at the university. Rather, asserts the university, it was Jacqueline Avery, not plaintiff, who reported Henderson's embezzlement to the campus police, the Los Angeles Police Department and the state auditor. The university contends that plaintiff merely did her job when she reported wrongdoing to Avery, and with respect to the alleged misuse of earthquake retrofit funds to remodel defendant Rosser's office, plaintiff did not report that to anyone. Moreover, asserts the university, while plaintiff states that the uncovering of misuse of state assets took place in 1996 and early 1997, Garcia did not come to the university until June 1997.

The university applies the concept of whistleblowing too narrowly. It is true that plaintiff was simply doing her job when she uncovered the unauthorized use of state assets by Henderson and others associated with facilities operations. It is also true that she reported her findings to Avery rather than to some other governmental agency. This, however, will not defeat her right to whistleblower status. First, plaintiff was employed by a governmental agency and she had every reason to expect that Avery would not sweep the information under the rug but rather would conduct an investigation into the

---

[6]As discussed *post*, California's Tort Claims Act (Gov. Code, § 900 et seq.) "requires that a claim for money or damages must first be presented to the pertinent public agency and rejected by it." (*Spencer v. Merced County Office of Education* (1997) 59 Cal.App.4th 1429, 1434 [69 Cal.Rptr.2d 750].)

[7]In deciding this appeal, we will focus on just one aspect of plaintiff's tort claim—the whistleblower allegations. We draw no conclusions respecting her claim that she was directed to commit illegal actions in carrying out her duties at the university. Nor do we address the cause of action discussed in *Garcia v. Rockwell Internat. Corp.* (1986) 187 Cal.App.3d 1556 [232 Cal.Rptr. 490]—wrongful *discipline* in violation of public policy.

matter, as Avery did. Thus, plaintiff, in contrast to an employee of a private employer, had no need to inform some other governmental agency in order to qualify as a "whistleblower" within the meaning of Labor Code section 1102.5, subdivision (b). (Compare with *Green v. Ralee Engineering Co.,* *supra,* 19 Cal.4th at pp. 72-73, 76-77.)

Indeed, it would seem reasonable that Avery was the person whom the university would expect plaintiff to advise about the wrongdoing she had uncovered, rather than taking it upon herself to inform some other governmental agency. Moreover, it is clear that plaintiff was an integral part of the whistleblowing process, as were Avery and Roshni Thomas (who also reported wrongdoing to Avery). It is contended by plaintiff that all three women ultimately left the university because of Garcia's actions. Plaintiff presented the trial court with evidence that a university human relations manager had always felt the three women were being targeted for termination. What the three women had in common was their gender, their status as employees in Garcia's department, and their activities in association with uncovering wrongdoing, and according to Avery, Garcia told her he fired Thomas because "he was not going to allow Ms. Thomas or anyone else to hold him or President Rosser hostage to information." Suzanne Curtis felt that the person with the real concern about Avery and plaintiff was Rosser himself. Such evidence would clearly support a jury's conclusion that the actions taken against plaintiff were in retaliation for her whistleblowing activity.

### 5. *Plaintiff Presented Evidence of a Breach of an Implied Employment Contract*

█ Citing *Foley v. Interactive Data Corp., supra,* 47 Cal.3d at page 680, the *Turner* court observed that an implied employment agreement may be found in the employer's personnel practices and policies and the employee's length of service. (*Turner, supra,* 7 Cal.4th at p. 1252.) Here, plaintiff presented evidence, respecting both factors, that raises a triable issue whether she had an implied employment contract rather than "at-will" employment (Lab. Code, § 2922) with the university. Garcia testified that it is not the practice of the university to terminate employees without cause, and he acknowledged there was no cause to terminate plaintiff. Additionally, plaintiff worked for the university for over 21 years, working her way up from receptionist to director of procurement, contracts and support services, continually receiving superior performance ratings. This is evidence of what *Foley* called an "enforceable expectation" about continued employment. (*Foley,* at p. 680.) Coupled with the triable issue whether plaintiff was constructively discharged, the evidence would warrant trying a cause of

action for breach of an implied employment agreement, *if plaintiff had alleged one*. Since we are sending this back for trial, plaintiff will be free to seek permission to amend her complaint to allege such a count. California has a policy of liberality in permitting amendments to pleadings during the course of litigation. (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 945 [65 Cal.Rptr.2d 777].)

### 6. *The University Has Not Negated the Issue of Damages*

■ The university contends plaintiff has not, and cannot, establish a causal connection between the university's actions and plaintiff's medical disability, that is, she cannot establish damages caused by the university. The university asserts that its evidence *establishes* that plaintiff was granted medical disability because of her objective medical conditions of fibromyalgia and rheumatoid arthritis, and that those conditions were not caused by the university. We do not agree.

#### a. *Plaintiff's Application for Disability Retirement Does Not Support the University's Position*

On her application for disability retirement, dated June 21, 1998, plaintiff was asked: "What is your specific disability and when and how did it occur?" She answered: "Diagnosis: Fibromyalgia, Rheumatoid Arthritis Was diagnosed approx. 11 yrs ago. Exacerbations occur causing extreme pain in my arms, wrist, shoulders, hips and knees, swelling and arthritic stiffness knees and hands, extreme fatigue prevents me from performing my duties. Am unable to work full time due [*sic*] the fatigue, pain, and difficulty attention span [*sic*], memory and communication. Stress further exacerbates my condition." The application form also asked: "Was your injury caused by a third party? (Subrogation)."[8] Plaintiff answered: "No." The application was signed under penalty of perjury.

We find nothing in plaintiff's application that precludes a finding of a nexus between plaintiff's medical condition as supporting disability retirement, and her contention that the university's treatment of her after Garcia arrived at the university in the spring of 1997 exacerbated the medical condition she already had, and did so to the extent that she could no longer work. She simply described her disability and its progression. As for the subrogation question, absent definitive evidence about what plaintiff thought that question meant, we cannot say that her "no" answer precludes a claim for damages against the university.

---

[8]In setting out, in its appellate brief, this question about third parties, the university left out the word "subrogation."

b. *The PERS Medical Reports and PERS Letter Do Not Support the University's Position*

The appellate record also contains reports from four doctors who used a two-page PERS medical report form to report on plaintiff's medical condition. According to the diagnosis of Andrew Muller, M.D., who is board certified in internal medicine, and who first saw plaintiff in 1986, plaintiff has rheumatoid arthritis complicated by fibromyalgia, with severe limitation in her hands, feet, hips and shoulder, including a 40 percent range of motion in her shoulder. The university asserts the report "directly refutes [plaintiff's] allegations that the reason she applied for PERS medical disability was because of retaliatory action and intolerable work conditions caused by [the university]." It asserts that plaintiff cannot credibly contend that people at the university caused her to have a severely limited range of motion in her shoulder.

Peng Thim Fan, M.D., who first saw plaintiff in 1997, is a clinical professor of medicine in the division of rheumatology at the University of California Los Angeles school of medicine. His diagnosis is "fibromyalgia chronic fatigue, rheumatoid arthritis." He found "swelling in the wrist and knees and severe reduction in [range of motion] in the wrist and the ankles." The university asserts that surely "people at [the university] did not cause [plaintiff's] wrists and knees to swell." Dr. Fan reported he advised plaintiff to reduce the amount of prednisone she was taking, but warned her that her fibromyalgia symptoms would flare up when she did so. The university argues that it cannot be blamed for a reduction in her prednisone dosage.

Emilio Cruz, M.D., had a diagnosis of "fibromyalgia and chronic fatigue syndrome chronic pain syndrome." He reported memory loss and a progressive, severe gait condition. Maria T. Cendejas, D.O., first saw plaintiff in August 1995. She reported a "gradual onset" of plaintiff's illness. Her diagnosis was "cervical and lumbar myofascitis compounded by fibromyalgia and degenerative disease. Belated knee degeneration."

In its November 20, 1998 letter to plaintiff, PERS advised her that her application for disability retirement was approved, and stated its finding that she was "incapacitated for the performance of [her] duties . . . based on [her] internal (arthritis/chronic pain) condition." The university asserts it is thus "clear that the reason [plaintiff] was granted medical disability retirement by PERS, was because of her objective medical conditions, which had first been diagnosed eleven years previously and had gradually worsened— not because of any supposed retaliation or intolerable conditions at work.

[Plaintiff's] doctors verified that she had fibromyalgia and rheumatoid arthritis. Her four doctors said that [she] was not injured on the job. Not one of the doctors said that [the university], or any person at [the university], had caused [plaintiff's] medical conditions."

We do not agree that the evidence presented by the university in the form of the doctor's reports (and the resulting PERS letter) conclusively negates a nexus between plaintiff's working conditions and the deterioration of her health. To begin with, that question was not asked of the doctors on the PERS medical report. The question whether plaintiff was injured (on or off the job) is not the same question as whether her working conditions had anything to do with the worsening of her fibromyalgia. There is no indication that the doctors did not understand the term "injury" in a more general sense, such as whether plaintiff fell, was hit by something, tripped, and so forth.

Moreover, the expertise of these four physicians is medicine, not law. They are doctors, not attorneys specializing in personal injury torts and workers' compensation law. The university argues that their "diagnoses concern whether and why [plaintiff] should receive medical disability retirement." That is precisely the point. The physicians were concerned about medical disability, not subsequent lawsuits. They filled out medical reports, not tort claims under the Government Code. We cannot say, *as a matter of law*, that their medical reports, furnished for plaintiff's application for disability retirement, preclude her cause of action for tortious constructive termination (or a cause of action for constructive termination in breach of an implied employment contract). We cannot say that their reports negate her contention that the stress (anxiety, fear, humiliation, degradation) she asserts she was subjected to when Garcia became her supervisor and when, according to the evidence she presented, he set out to virtually destroy the reputation and position that she had spent some 21 years creating at the university, contributed in a significant way to the worsening of her medical conditions such that she eventually was unable to continue working. Therefore, plaintiff had no need to present medical evidence of her own to refute the university's medical evidence.

### DISCUSSION OF THE UNIVERSITY'S CROSS-APPEAL

1. *A Disability Retirement Does Not Preclude a Finding of Constructive Discharge*

 In its cross-appeal, the university challenges the trial court's order denying its initial request for summary adjudication of plaintiff's cause of

action for wrongful constructive discharge. The university based that first motion for adjudication solely on the fact that plaintiff did not actually quit her job, but rather took a disability retirement. The university asserted that a disability retirement cannot be the functional equivalent of a resignation or a service-based retirement, because with a disability retirement the employment relationship is not necessarily severed, and therefore, disability retirement will not support a cause of action for constructive wrongful discharge.

In its order denying that original adjudication motion, the trial court took note of the university's point that plaintiff is functionally in a state of extended medical leave of absence and has not actually severed her employment with the university as she would have if she had taken a service-based retirement or had simply quit her job. Thus, said the court, under Government Code section 21193, she can request reinstatement to her duties if she is ever found to be no longer incapacitated. The court also observed that California recognizes a tort of wrongful discipline, falling short of an actual wrongful discharge, imposed as retaliation for whistleblowing, and in such cases, the employee is still at his or her job. (*Garcia v. Rockwell Internat. Corp., supra,* 187 Cal.App.3d 1556.) The trial court stated it was "not persuaded that plaintiff's ability to establish constructive termination is defeated because a statute ([Gov. Code,] § 21193) would permit her in [the] future to request reinstatement on the ground of recovery. No policy of the law would be served by requiring a plaintiff in this situation to submit a formal resignation after receiving board approval of an application [for disability retirement], or to resign outright, and thus [forgo] entitlement to disability retirement payments. With or without a formal resignation letter, plaintiff no longer works for [the university] and no longer has her job in the Office of Administration and Finance. That she has the safety net of disability retirement should not allow defendant to escape the consequences of the wrongful acts, which are alleged to have driven plaintiff to request disability retirement. Because a *Tameny* [*v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]] claim can be stated on the basis of adverse employment action short of termination (see *Garcia* [*v. Rockwell Internat. Corp., supra,* 187 Cal.App.3d 1556]), plaintiff's constructive termination claim in this case is not defeated by the theoretical possibility that, should she someday recover from her disability, she would be legally entitled to apply for reinstatement."

On appeal, the university presents what it describes as five points that demonstrate why an employee who takes a PERS disability retirement cannot reasonably claim constructive discharge. First, it argues that plaintiff's continuing right, under PERS legislation, to be reinstated to her duties at the university if she sufficiently recovers her health is inconsistent with

the notion of a plaintiff's coerced termination of the employer-employee relationship that is the basis of the doctrine of constructive discharge.

Next, the university argues that the ability to receive disability retirement, which only exists when the employee is still in an employment relationship, is inconsistent with the concept of a constructive discharge. Third, the university contends that under PERS legislation, specifically Government Code section 21153, an employer has the obligation to apply for disability retirement for a disabled employee who is eligible to retire for disability unless the employee waives the right to retire for disability and elects to either withdraw her contributions or to keep her contributions in the fund and invoke her right to service retirement under section 20731. The university contends this obligation on its part to apply for disability on behalf of plaintiff had she not done so herself "cannot constitute a constructive discharge."

Fourth, relying on Government Code section 21153's prohibition against discharging an employee, because of the employee's disability, if the employee is entitled to retire for disability, the university argues that "[t]his forced retention of the employee by the employer is inconsistent with the [*Turner* court's] requirement of coerced termination of employment." Finally, the university contends that the decision of PERS, a state agency independent of the university, and the entity that makes the decisions on applications for disability retirement, finding plaintiff entitled to disability retirement is inconsistent with the concept of constructive discharge, "which requires the employer to have coerced the employee's resignation."

We are not inclined to substitute what the university sees as the logic of its several points, for what is the *true* logic of plaintiff's case—that the university, through its agents, allegedly made plaintiff's working conditions so intolerable that her preexisting medical condition worsened to the point where she was no longer able to function in her duties and *needed to remove herself from her job*, and thus was *effectively* constructively discharged. We reject the notion that an abusive employer has the right to orchestrate how its employee exits her employment by demanding that the employee quit or take a service retirement before acquiring a cause of action for wrongful constructive discharge. That plaintiff may recover sufficiently to reclaim her position does not negate the fact that she may not so recover.

We also reject the university's contention that *Mullins v. Rockwell Internat. Corp.* (1997) 15 Cal.4th 731 [63 Cal.Rptr.2d 636, 936 P.2d 1246] supports its position. In *Mullins*, the plaintiff employee took two medical

leaves of absence before he submitted his resignation and sued for wrongful constructive termination. He alleged the leaves of absence were necessitated by the stress and humiliation that his employer's treatment of him caused him to feel. The issue in *Mullins* was whether the statute of limitations on a constructive-termination breach of contract cause of action begins to run when the alleged intolerable working conditions occur, or when the employee actually resigns. (*Id.* at p. 733.) The Supreme Court held that in any contract action for wrongful termination of employment, the statute of limitations begins to run from the date of actual termination, whether or not the employee alleges a constructive discharge. (*Id.* at pp. 733-734.) Based on that holding, the university asserts that the Supreme Court "dismissed the idea that medical leave constituted a coerced resignation [and] instead, the Court held that only actual resignation triggered a constructive discharge." We disagree with the university's analysis of *Mullins*. Given that the Supreme Court was not presented with the situation of a disability retirement where an employee does not actually sever her relationship with her employer, we do not find *Mullins* persuasive authority for the issue raised by the university in this case, to wit, whether such a disability retirement is inconsistent with a claim of constructive discharge.

Additionally, we reject the university's contention that if a medical disability retirement can support a cause of action for constructive wrongful discharge, then any member of PERS that takes a disability retirement in the future can sue and allege constructive discharge. That possibility is no different from the fact that any member of PERS who *quits* his or her job in the future can assert a cause of action for constructive wrongful discharge. In both situations, as in any wrongful discharge case, the facts will either bear out the plaintiff's cause of action or they will not.

Lastly, we note that the university's position would force employees who are *not* qualified for service-based retirement, but who have been so wrongfully treated by their employer that their health has deteriorated to the point that they qualify for disability retirement, to choose between taking the disability retirement and thereby losing the right to sue for constructive wrongful termination, or quitting their job in order to sue for constructive wrongful termination and thereby losing their right to PERS disability retirement. We will not adopt a rule that foists such an unreasonable choice on them.

### 2. *The Administrative Claim Filed by Plaintiff Was Timely*

Government Code sections 905.2, 911.2 and 945.4, provisions of California's Tort Claims Act, govern plaintiff's right to sue the university. Collectively, they provide that a suit against the state for money or damages

generally may not be brought unless and until a plaintiff has first presented the state with a written claim. When a plaintiff's cause of action is for death, or for injury to person or personal property or growing crops, such written claim must be presented no later than six months *after the plaintiff's cause of action has accrued*. For claims "relating to any other cause of action," a one-year period is provided. Here, plaintiff filed her claim with the State Board of Control on January 5, 1999. Thus, if her cause of action against the university for tortious wrongful constructive discharge accrued prior to July 5, 1998, it was not timely filed. The university contends plaintiff's cause of action accrued on June 21, 1998, the day on which she executed her PERS application for medical disability retirement.

We rely on *Mullins v. Rockwell Internat. Corp., supra*, 15 Cal.4th 731, and *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479 [59 Cal.Rptr.2d 20, 926 P.2d 1114] to resolve this question of timeliness. As already noted, the *Mullins* court held that in breach of contract actions alleging constructive wrongful termination of employment, it is the actual termination of employment that starts the statute of limitations period running, not when the alleged intolerable working conditions occur. (*Mullins, supra*, at pp. 733-734.) Similarly, in *Romano*, the court held that in wrongful termination cases, whether the plaintiff alleges contract or tort causes of action, or violations of California's Fair Employment and Housing Act, the statute of limitations begins to run on the date the employment is actually terminated, not the date on which an employee is unequivocally informed his employment will be terminated. (*Romano, supra*, at pp. 483-484.) When we combine these holdings with Code of Civil Procedure section 312's directive that statutes of limitation begin to run "after the cause of action shall have accrued," we conclude that for purposes of filing a tort claim for wrongful termination, the cause of action accrues when the employment is actually terminated, whether by the employer or the employee. In the instant case, that would be the day plaintiff commenced her disability retirement since the act of taking disability retirement was the functional equivalent of a constructive discharge.

On June 21, 1998, plaintiff signed her *application* for disability retirement, but she was not automatically given disability retirement on that date. By letter dated November 20, 1998, she was informed that her application for disability retirement had been approved, and that the *effective date* of such retirement would not be earlier than the day following her last day of using sick leave with compensation or other leave of absence with compensation. Based on these facts, it is clear that plaintiff's tort claim was timely filed.

## DISPOSITION

The summary judgment is reversed and the cause is remanded for further proceedings consistent with the views expressed herein. Costs on appeal to plaintiff.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied March 4, 2003, and on February 18, 2003, the opinion was modified to read as printed above.