[No. A131833. First Dist., Div. Three. Jan. 31, 2013.]

BRIAN McVEIGH, Plaintiff and Appellant, v.
RECOLOGY SAN FRANCISCO et al., Defendants and Respondents.

## COUNSEL

David C. Anton, John H. Scott and Lizabeth N. de Vries for Plaintiff and Appellant.

Sean M. SeLegue, Jonathan W. Hughes and Gilbert J. Tsai for Defendants and Respondents.

## OPINION

**SIGGINS, J.**—Plaintiff Brian McVeigh appeals following the grant of summary judgment in favor of his former employer Recology San Francisco.[1] Recology provides waste collection, recycling and disposal services to San Francisco residents and businesses. McVeigh's complaint alleged that Recology fired him in retaliation for his reporting possible fraud in connection with California redemption value payments made by and to Recology for recycled materials.

McVeigh's whistleblower causes of action were brought under Government Code section 12653, part of California's False Claims Act (CFCA) (Gov. Code, § 12650 et seq.), and Labor Code section 1102.5. Government Code section 12653 prohibits an employer from discriminating against an employee for acts taken to expose false claims presented to the government. Labor Code section 1102.5, subdivision (b), prohibits an employer from discriminating against an employee for reporting unlawful conduct to the government.

In reviewing whether summary judgment was proper under the CFCA, we will discuss whether the state was harmed by the alleged fraud reported by McVeigh and whether his report of possible fraud was protected conduct under the statute. In order to determine whether summary judgment was proper under the Labor Code provision, we will consider whether the statute

---

[1] Recology San Francisco was formerly known as SF Recycling & Disposal, Inc. The other defendants are Recology Service Center, formerly known as Norcal Waste Service Center, Inc., Sunset Scavenger Company, and Recology, Inc., formerly known as Norcal Waste Systems, Inc., the other entities' parent company. Since defendants' status as separate entities is immaterial to the issues on appeal, we will refer to them collectively and severally as "Recology."

protects an employee from discrimination for reporting illegal acts by fellow employees or only illegal acts of his or her employer.

We reverse the summary judgment on three of McVeigh's causes of action, and affirm the judgment for Recology on two others. Because McVeigh did not demonstrate that the fraud alleged in one of his causes of action under the CFCA involved possible financial harm to the state, summary judgment was proper on that claim. We conclude as to his other CFCA cause of action that McVeigh alleged possible fraud on the government that caused it economic harm and that his reporting of fraud was protected conduct. We also conclude that the Labor Code protects an employee from discrimination for reporting claims of illegal conduct by fellow employees as well as by an employer.

## I. BACKGROUND

McVeigh began working for Recology in 2000. From late 2004 through late November 2005, he was an operations supervisor at Pier 96, a Recology facility where recyclables collected from various sources are sorted for processing and sale to vendors. Recology also operated two buy-back centers, one at Pier 96 and one at 501 Tunnel Road in Brisbane, where employees weighed customers' recyclables presented for redemption, such as glass bottles and aluminum cans. The employee who weighed the material would write the weight on a tag and give the tag to the customer. The customer brought the tag to a cashier, who logged the material and weight into a computer showing the date and time, and paid the customer the California redemption value (CRV) in cash for the weight shown on the tag.

In addition to buy-back center purchases, Recology collected CRV recyclables from various sources, including "curbside" collection. Recology aggregated, processed, and weighed the recyclables from all sources at Pier 96 and shipped them to third party purchasers with a form DR-6 that showed their weight. Bales of recyclables collected from the different sources were commingled before they were shipped from Pier 96. The sources of the materials were not shown on the bales, but the weight of recyclables purchased at the buy-back centers was distinguished from the weight of other recyclables on the DR-6 forms. The purchasers verified the weights they received, recorded them on a form DR-7, and the DR-6 and DR-7 forms were submitted to the Department of Conservation, which reimbursed Recology the CRV. Recology was reimbursed at a higher rate for recyclables purchased at the buy-back centers than for recyclables collected from other sources.

Around September 2005, Pier 96 supervisor Bo Duong received a tip that an employee was engaged in "tag inflation" fraud and asked McVeigh to investigate. Tag inflation fraud occurs when an attendant records more weight

on the tag than the weight of the recyclables actually bought back by Recology, resulting in an overpayment by Recology to the customer, and possibly a kickback to the attendant. The suspected employee admitted committing tag inflation in collaboration with a buy-back attendant. McVeigh reported this information to Pier 96 general manager John Jurinek, who directed him to call the San Francisco police, and the employees were arrested. McVeigh also received tips from coworkers that tag inflation was occurring at Tunnel Road. In September 2005, McVeigh reported information about tag inflation at Pier 96 and Tunnel Road to San Francisco Police Officer James Lewis.

While he was assigned to Pier 96, McVeigh worked under Jurinek and operations manager Joe Damele. McVeigh was counseled by Jurinek and Damele because they were concerned about his "overly aggressive" management style. Pier 96 employees complained that McVeigh seemed intent on finding wrongdoing and said he was "witch-hunting" or "stalking." Numerous union members filed grievances against him, and Jurinek said McVeigh had a "cop mentality."[2] In November 2005, Damele gave McVeigh a performance rating of three on a scale going from a low of one to a high of five. The rating reflected satisfactory job performance and Damele had never given anyone a four or five.

That same month, McVeigh transferred from Pier 96 to Tunnel Road. In addition to a buy-back center, Tunnel Road houses a public waste dumping area and an industrial material recycling facility (IMRF). McVeigh was assigned to supervise the IMRF, where recyclable materials are separated from industrial waste. He worked under operations manager Ken Stewart.

McVeigh told Stewart that he had reported tag inflation to Officer Lewis, and informed Stewart that Lewis had a business that supplied video surveillance equipment that could be used by Recology to detect and deter the fraud. In January 2006, Stewart told McVeigh that video equipment would not be installed, and ordered him "to stay out of the CRV Buy Back business" and "only mind . . . the IMRF." Thus, from January 2006 to September 2007, when McVeigh was made supervisor of the Tunnel Road buy-back center, he did not report his "concerns of CRV theft scams of State funds" even though he continued to receive tips of ongoing fraud.

---

[2] In addition to tag inflation, McVeigh reported the following problems to his supervisors at Pier 96: "(1) employees not being in their assigned positions; (2) threats between employees, or directed at him; (3) employees who attempted to steal processed material; (4) employees engaged in unsafe work practices, such as throwing material in an unsafe manner; (5) employees driving in an unsafe manner; (6) employees showing pornography to other employees."

In November 2006, Stewart also gave McVeigh an overall annual performance rating of three. Toward the end of that month or in early December 2006, an employee accused McVeigh of, among other things, "[m]isuse of authority" and "caus[ing] turmoil amongst employees." A human resources specialist investigated the accusations and determined that McVeigh had acted "unprofessionally" in his dealings with employees. He was placed on a 90-day "Performance Improvement Plan," which included "a training course on dealing effectively with others."

In September 2007, when McVeigh was put in charge of the Tunnel Road buy-back center, Stewart told him that he was to "straighten out the facility," and McVeigh understood his duties to include preventing tag inflation. He suspected that tag inflation was occurring, and that "management was involved in some type of coverup" of the problem. He reported his suspicions to Sergeant Thomas Lynn of the Brisbane Police Department.

In October 2007, Stewart gave McVeigh a two on his performance review, and as a result McVeigh received no raise or bonus. At a meeting with Stewart and Tunnel Road general manager Mike Crosetti, McVeigh claimed that he was being denied a raise and bonus in retaliation for his reporting of tag inflation. Stewart and Crosetti refused to change his performance score.

To deter tag inflation, McVeigh spent increasing time at the weigh-in station and told employees that he was beginning to look over each day's CRV weight records. Once he started doing so, the buy-back center's average daily CRV payout dropped, from over $13,000 per day in the first two weeks of October 2007 to $7,000 per day from November 15 to 24, 2007. Based on this observation, McVeigh believed he was saving Recology $100,000 per year. He recommended that handwritten weight tags be replaced with a system where "the scale [was] tied directly into the tag printout, but this did not happen while [he] was employed with [Recology]." He again recommended use of video surveillance equipment, which was installed beginning on November 23.

After the video equipment was installed, McVeigh obtained "obvious video evidence that attendant Andre Lewis was engaged in large and repeated weight tag inflation." At a meeting on December 18, McVeigh, Stewart, and another Tunnel Road supervisor confronted Lewis with video clips that showed him inflating weight tags, and Lewis admitted having done so. Crosetti thought that Lewis must have been getting kickbacks in exchange for the fraud. When Lewis was interviewed by Pier 96 general manager Jurinek and human resources representative David Jackson, he implicated three other employees in the scheme, including two Tunnel Road attendants, Luis Hernandez and Jose Castellanos, who had also aroused McVeigh's suspicions. Lewis was transferred from Tunnel Road to Pier 96.

By January 2008 the average daily CRV refund payout at Tunnel Road was less than $5,000. McVeigh believed that only a small part of this reduced payout was attributable to a ban on walk-in customers that began on November 27. McVeigh suspected that "massive" "CRV theft" was ongoing at the buy-back center, and recommended that Recology hire a private investigator to look into the problem. Stewart agreed with the recommendation, but Crosetti told him that the company rejected it.

Because McVeigh suspected fraud was continuing at Tunnel Road, he told Sergeant Lynn that Lewis had been caught inflating weight tags, that Recology had not fired or pressed criminal charges against Lewis, that other employees had been implicated in weight tag inflation, and that Recology would not hire a private investigator to look into the matter. McVeigh reported to Stewart that the Brisbane Police Department was willing to investigate "the fraudulent CRV theft scams" at the Tunnel Road buy-back center, but the District Attorney's office required that Recology agree to press charges against anyone caught. Stewart advised McVeigh that upper management rejected the proposal for a police investigation.

McVeigh's concerns that there were large losses associated with CRV buybacks were based in part on accounting information he received in December 2007. Apparently, the weights of recyclables purchased at the Tunnel Road buy-back center in November significantly exceeded the weights of materials transferred that month from Tunnel Road to Pier 96 for processing. For example, over seven tons less aluminum showed up at Pier 96 (16.56 tons) than were purchased at Tunnel Road (23.60 tons). Information McVeigh received about amounts purchased and transferred from December 1 through 11, after the video surveillance cameras were installed, showed more modest but continuing shortages. For example, 6.45 tons of aluminum were purchased and 5.83 tons were transferred, a discrepancy of 0.62 tons.

On February 4, 2008, McVeigh filed an online "EthicsPoint" report that was transmitted to senior management and the Recology board of directors. The report alleged that Recology employees had engaged in tag inflation and that Recology managers were aware of the problems but had not remedied them. Recology's outside counsel was called in to investigate the EthicsPoint report, and interviewed McVeigh and other witnesses.

On February 19, Stewart called McVeigh into a supply room, locked the door, and "threatened [McVeigh] with being fired for continuing to push the issue of CRV fraudulent theft." McVeigh reported the confrontation to human resources representative Jackson, and met with Jackson to discuss his concerns about "fraudulent theft of CRV funds." Jackson initially told McVeigh

that a private investigator would be hired to investigate the fraud, but then informed him "that the investigation had been cancelled."

General manager Crosetti and human resources manager Kathy Jamison asked Jackson to investigate McVeigh's allegations. McVeigh reported to Jackson that, in addition to tag inflation, Recology employees were involved in a " 'truck theft scam' " in which they conspired to steal CRV recyclables from trucks during transport for processing from Tunnel Road to Pier 96. McVeigh had received a tip that a driver was stopping his truck in route to Pier 96 so that a customer with whom another employee had a relationship could off-load CRV recyclables and resubmit them for a second CRV refund.

Jackson asked McVeigh about possible marijuana scavenging in the public disposal area of Tunnel Road. McVeigh told Jackson that large quantities of marijuana were dumped with "some frequency" in the area, and that "loader drivers had reported that employees in the pit were scavenging marijuana and it was dangerous [because] the loaders could run over the employees without seeing them." McVeigh reported that Stewart had ordered that steps be taken to stop the scavenging, but the supervisor in charge of the public disposal area "did not appear to be dedicated to stopping the activity."

McVeigh declared in opposition to the motion for summary judgment: "I became extremely concerned that management did not want a real inquiry into the CRV theft issues, and that my job was being threatened for doing what I thought was something I needed to do in my job both for the company and to protect public funds in the State CRV program. I felt I had to try to find out what was actually taking place with State funds, that it was the right thing to do even if my job was being threatened by my managers for doing it. I continued to review CRV records, continued to inform Sergeant Lynn, and continued to inform my management that I was doing these actions."

The records McVeigh continued to review included truck shipment logs for transfers of CRV recyclables from Tunnel Road to Pier 96, which showed the weight of the recyclables when they left Tunnel Road, the weight when they arrived at Pier 96, and the duration of the trip. He discovered what he considered to be irregularities. For example, a truck was shown as leaving Tunnel Road at 5:29 a.m. on February 25, 2008, with 2,340 pounds of aluminum, and arriving at Pier 96 at 6:06 a.m. with 1,920 pounds of aluminum. The trip that should have taken 10 minutes lasted 37 minutes and ended with 420 pounds less of aluminum than when it began. McVeigh estimated from experience with the trucks that a driver and two people could off-load 100 to 200 pounds of CRV recyclables in two minutes. Information such as what he discovered in the February 25 truck shipment log heightened McVeigh's concern about theft.

Jackson prepared a report dated May 13, 2008, recommending that McVeigh "be separated from this organization immediately," and McVeigh was placed on administrative leave that day. Jackson found that McVeigh had a "headstrong attitude" and could not get along with other employees. He "stir[red] up gossip, arguments, and conflicts on a regular daily basis." His "peers and supervisors made a point of avoiding him," and did not believe he "could be trusted to uphold the organization's best interests." He "had chosen to 'remove himself' from the rest of the team and not partner collaboratively with the management."

The report did not discuss "tag inflation" by that name, but apparently considered the issue in addressing McVeigh's allegations of "misappropriation of cash and cash receipts" at the Tunnel Road buy-back center by two African-American supervisors and an African-American employee. The report stated that "McVeigh did not focus on the activity of the Hispanic employees [(presumably, Hernandez, Castellanos, and Juan Gomez, another employee implicated by Lewis)] who had been widely suspected for some time by members of senior management of the same questionable conduct that McVeigh had accused the African-American employees of perpetrating." Jackson determined that McVeigh's allegations against the African-American employees could not be substantiated. Neither could his many other allegations,[3] including marijuana scavenging in the public waste disposal area. Employees who worked in the disposal area told Jackson that the marijuana remnants left there were unusable " 'junk.' "

General manager Crosetti concluded that McVeigh's allegations were made in bad faith, and terminated his employment on May 28, 2008.

McVeigh sued Recology in August 2009. His complaint contained five causes of action. The first and second alleged that he was wrongfully terminated in violation of the CFCA whistleblower statute. (Gov. Code, § 12653.) The third cause of action alleged that his termination was in

---

[3] The report addressed McVeigh's claims that: customers were being harassed and intimidated at the IMRF facility at Tunnel Road; illegal drugs were being stored, used, and sold in the waste disposal area; specified supervisors were unable to manage the conduct of hourly personnel; specified supervisors went home during their shifts and left plant operations unsupervised; specified supervisors lacked the training and skill to handle difficult "operational and employee related issues"; specified supervisors had covered up dangerous fires employees started at the plant; employees working on the sort line under a particular supervisor were smoking marijuana and "throwing objects from the line"; employees on the sort line were taking unauthorized breaks to " 'hang out' " in the office of that supervisor; and employees working under specified supervisors were engaging in "[h]igh-speed exhibitions with company vehicles chasing seagulls in [the] plant." McVeigh also alleged that Stewart had threatened to fire him for investigating misconduct within the company, and another supervisor had warned him that his personal safety might be "at risk for 'breaking the circle of trust' among the management team for expressing concerns of management misconduct."

violation of public policy. The fourth cause of action alleged he was terminated in violation of whistleblower protections in the Labor Code. (Lab. Code, § 1102.5, subd. (b).) The final cause of action alleged his termination was in breach of an implied contract that he could not be discharged without good cause.

Recology moved for summary judgment, arguing that McVeigh could not establish a prima facie case for the CFCA and Labor Code causes of action. The trial court granted the motion. It concluded that the whistleblower causes of action failed because McVeigh was merely performing his "regular job responsibilities" in investigating and reporting on weight tag inflation, and thus Recology did not know that he was engaging in protected activity. Also, McVeigh could not establish that his employment was terminated due to protected activity because he was not fired until almost three years after he first blew the whistle on the alleged tag inflation scheme. Because his whisteblower claims were untenable, so was his cause of action for termination in violation of public policy.

He has timely appealed from the judgment entered for Recology. He does not contest the judgment on his fifth cause of action for breach of an implied contract.

## II. DISCUSSION

### A. *Scope of Review*

"The rules of review [of a summary judgment] are well established. If no triable issue as to any material fact exists, the defendant is entitled to a judgment as a matter of law. [Citations.] In ruling on the motion, the court must view the evidence in the light most favorable to the opposing party. [Citation.] We review the record and the determination of the trial court de novo. [Citations.]" (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499 [64 Cal.Rptr.3d 803, 165 P.3d 581].)

### B. *False Claims Act Causes of Action*

#### (1) *Whistleblower Protection Under the CFCA*

The CFCA "permits the recovery of civil penalties and treble damages from any person who knowingly presents a false claim for payment to the state or a political subdivision." (*State of California ex rel. Standard Elevator Co., Inc. v. West Bay Builders, Inc.* (2011) 197 Cal.App.4th 963, 973 [130 Cal.Rptr.3d 99] (*Standard Elevator*).) The ultimate purpose of the law is " ' "to protect the public fisc." ' " (*Wells v. One2One Learning Foundation*

(2006) 39 Cal.4th 1164, 1196 [48 Cal.Rptr.3d 108, 141 P.3d 225] (*Wells*).) "A CFCA action may be initiated by any person, as a qui tam plaintiff, in the name of the state or political subdivision whose funds are involved," and such plaintiffs receive a significant portion of CFCA litigation proceeds. (*Standard Elevator, supra,* 197 Cal.App.4th at p. 973.) The CFCA " 'ferrets out fraud on the government by offering an incentive to persons with evidence of such fraud to come forward and disclose that evidence to the government.' [Citations.] The typical whistleblower 'is unsophisticated in the legal intricacies of fraud law, and . . . happens across evidence of fraud during the course of employment.' " (*State of California v. Pacific Bell Telephone Co.* (2006) 142 Cal.App.4th 741, 746 [48 Cal.Rptr.3d 427], fn. omitted.)

The CFCA is modeled on the federal False Claims Act (FFCA; 31 U.S.C. § 3729 et seq.; *Standard Elevator, supra,* 197 Cal.App.4th at p. 973), and has comparable protection for whistleblowers. The federal provision prohibits an employee from being "discharged . . . or in any other manner discriminated against in the terms and conditions of employment [by his or her employer] because of lawful acts done by the employee . . . in furtherance of an action under [the FFCA] . . . ." (31 U.S.C. § 3730(h).) Until recently, the CFCA expressly added protection for whistleblowers who report to government and law enforcement agencies. It provided: "No employer shall discharge . . . or in any other manner discriminate against, an employee in the terms and conditions of employment because of lawful acts done by the employee . . . *in disclosing information to a government or law enforcement agency* or in furthering a false claims action, including investigation for . . . an action filed or to be filed under [the CFCA]." (Gov. Code, former § 12653, subd. (b), italics added.)[4]

■ McVeigh's first two causes of action allege that his employment was terminated in violation of this whistleblower provision of the CFCA. To establish a prima facie case, a plaintiff alleging retaliation under the CFCA must show: "(1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity." (*Mendiondo v. Centinela Hospital Medical*

---

[4] The italicized language has now been deleted from the statute. (Stats. 2012, ch. 647, §§ 4, 5.) The statute currently provides: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this article." (Gov. Code, § 12653, subd. (a).)

*Center* (9th Cir. 2008) 521 F.3d 1097, 1103; see *id.* at p. 1104 [retaliation claims under the FFCA and CFCA involve these same three elements].)

■ "As a statute obviously designed to prevent fraud on the public treasury, [Government Code] section 12653 plainly should be given the broadest possible construction consistent with that purpose." (*Southern Cal. Rapid Transit Dist. v. Superior Court* (1994) 30 Cal.App.4th 713, 725 [36 Cal.Rptr.2d 665] (*Rapid Transit*); see Gov. Code, § 12655, subd. (c) [the CFCA "shall be liberally construed and applied to promote the public interest"].) An "employee does not have to file a false claims action or show a false claim was actually made" to establish that he or she engaged in protected activity. (*Kaye v. Board of Trustees of San Diego County Public Law Library* (2009) 179 Cal.App.4th 48, 60 [101 Cal.Rptr.3d 456] (*Kaye*).) "[H]owever, the employee must have reasonably based suspicions of a false claim and it must be reasonably possible for the employee's conduct to lead to a false claims action." (*Ibid.*; see *U.S. ex rel. Yesudian v. Howard University* (D.C. Cir. 1998) 332 U.S. App.D.C. 56 [153 F.3d 731, 740] (*Yesudian*) [plaintiff must be "investigating matters that 'reasonably could lead' to a viable [FFCA] case"]; see generally *Kaye, supra,* 179 Cal.App.4th at pp. 59–60 [because the CFCA is patterned on the FFCA, cases interpreting the FFCA can guide interpretation of the CFCA].)

### (2) First Cause of Action

#### (a) Protected Conduct

Recology argues that McVeigh's investigation and reporting of weight tag inflation was not protected conduct under the CFCA because the reported fraud could not reasonably lead to a false claims action. (*Kaye, supra,* 179 Cal.App.4th at p. 60.) Even though the court did not grant Recology summary judgment on the CFCA causes of action on the ground that McVeigh's conduct was unprotected, we must address this contention. As we explain below, the court erred in finding that the other elements of McVeigh's CFCA claims—Recology's knowledge of McVeigh's protected activity, and retaliation against him for that activity—could not be established. Therefore we must consider whether the judgment for Recology on the CFCA causes of action can be affirmed on this alternative ground. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10] [summary judgment must be affirmed if it was correct on any applicable legal theory].)

#### (b) McVeigh's Argument

McVeigh's first cause of action seeks damages under the CFCA because he was terminated for reporting that Recology "employees assisted consumers to

obtain inflated CRV tags and payments." According to McVeigh, this "customer/employee CRV fraud is the basis for the First Cause of Action." He argues that "a False Claim is established by the fraud of customers and Recology employees in tag-inflation, regardless of whether Recology subsequently defrauded the State in seeking reimbursement." (Italics omitted.)

This argument is based primarily on the CFCA's definition of a "claim." "(1) 'Claim' means any request or demand . . . for money . . . that meets either of the following conditions: [¶] . . . [¶] (B) Is made to a contractor, grantee, or other recipient, if the money . . . is to be spent or used on a state . . . program or interest, and if the state . . . meets either of the following conditions: [¶] . . . [¶] (ii) Reimburses the contractor, grantee, or other recipient for any portion of the money . . . that is requested or demanded." (Gov. Code, § 12650, subd. (b).) McVeigh posits a situation where a customer submits 50 pounds of aluminum with a CRV refund rate of $2 per pound. The attendant issues a fraudulent weight tag for 100 pounds and the customer receives a $200 refund, rather than the $100 refund to which he or she is entitled. Recology reports the correct, 50-pound weight of the aluminum on the DR-6 form, and receives a $100 CRV reimbursement from the state. The state pays the correct reimbursement, but Recology suffers a $100 loss. Even though Recology was the only money loser, McVeigh contends that a customer's demand for payment based on the inflated weight tag is a false claim under the statutory definition because Recology operates a state program at its buy-back centers, and was reimbursed by the state for a portion of its CRV payment.

Apart from the language of the statute, McVeigh reasons that "[t]he CFCA was designed to help protect and recover public funds that were obtained fraudulently by others from the government or from government-sponsored programs. . . . The Legislature directed that . . . the CFCA is to be interpreted liberally and applied to accomplish its public purposes. [Citation.] The CRV tag-inflation fraud improperly obtains CRV funds and harms the California CRV program. The State has an interest in recycling centers being able to make a profit so that they stay in business, and false claims that steal from recycling centers put the financial viability of these centers at risk. [(Citing inter alia Pub. Resources Code, § 14501).] Applying the CFCA to customer/employee CRV fraud advances the purposes of the CFCA and protects recycling centers from fraudulent losses."

 (c) *Analysis*

█ We do not construe *Kaye*'s requirement that it be "reasonably possible for [the employee's conduct] to lead to a false claims action" (*Kaye, supra*, 179 Cal.App.4th at p. 60) to mean that a plaintiff is not protected

under the CFCA unless he or she has discovered grounds for a *meritorious* false claim action. As explained below in our analysis of the second cause of action, the plaintiff need only show a genuine and reasonable concern that the government was *possibly* being defrauded in order to establish that he or she engaged in protected conduct. Any more limiting construction or significant burden would deny whistleblowers the broad protection the CFCA was intended to provide. (*Rapid Transit, supra,* 30 Cal.App.4th at p. 725.)

Thus, it is not ordinarily necessary for a court to confirm the merits of a potential qui tam suit in order to determine whether the plaintiff has engaged in protected conduct. The context of the first cause of action in this case is unusual because McVeigh concedes that the fraud underlying the first cause of action did not result in any economic loss to the government. As we will explain, there is *no* possibility of a viable false claim in such a situation. Therefore, in this unusual context, the defense was entitled to summary adjudication of the first cause of action on that ground that no protected activity occurred.

"There is a dearth of California authority discussing what constitutes protected activity under the CFCA. However, because the CFCA is patterned .on [the FFCA], we may rely on cases interpreting the federal statute for guidance in interpreting the CFCA." (*Kaye, supra,* 179 Cal.App.4th 48, 59–60.) Of particular assistance here is the decision in *Hutchins v. Wilentz, Goldman & Spitzer* (3d Cir. 2001) 253 F.3d 176 (*Hutchins*). *Hutchins* interpreted FFCA provisions mirroring those of the CFCA on which McVeigh bases his claims. Like Government Code section 12650, subdivision (b), the FFCA defines a "claim," to " 'include[] any request or demand . . . for money . . . which is made to a contractor, grantee, or other recipient . . . if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money . . . which is requested or demanded.' " (*Hutchins, supra,* 253 F.3d at pp. 183–184, quoting 31 U.S.C. former § 3729(c).)

The CFCA is violated when a person "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval," or "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." (Gov. Code § 12651, subds. (a)(1) & (2).) Likewise, the FFCA is violated when a person " 'knowingly presents, or caused to be presented, to an officer or employee of the United States Government, or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval.' " (*Hutchins, supra,* 253 F.3d at p. 182, fn. 4., quoting 31 U.S.C. former § 3729(a)(1).)

The plaintiff in *Hutchins*, a paralegal in the creditors' rights department of a law firm, determined that the firm was overcharging clients for LEXIS and

Westlaw expenses. After being fired by the firm, the plaintiff filed a qui tam complaint under the FFCA, and an FFCA whistleblower action against the firm. The plaintiff argued that the firm's submission of inflated legal bills to the United States Bankruptcy Court violated the FFCA because the firm was presenting false or fraudulent claims to a federal official for approval. The *Hutchins* court affirmed dismissal of the qui tam action, holding that the FFCA "only prohibits fraudulent claims that cause or would cause economic loss to the government." (*Hutchins, supra*, 253 F.3d at p. 179.) The plaintiff's theory, "[a]lthough not linguistically implausible," had "no support [in] the jurisprudence interpreting the [FFCA]." (*Id.* at p. 183.)

The *Hutchins* court acknowledged that " 'recovery under the [FFCA] is not dependent upon the government's sustaining monetary damages.' " (*Hutchins, supra*, 253 F.3d at p. 183.) As a decision applying *Hutchins* explained: "[A] party can be subject to [FFCA] liability (i.e. civil penalties) even where the government suffers no monetary injury. . . . This is so, for example, where the government discovers that a claim is false before it makes payment . . . or where the government in essence passes on the cost of the false claim to a third party." (*U.S. ex rel. Sanders v. American-Amicable Life, TX* (3d Cir. 2008) 545 F.3d 256, 259, citation omitted (*Sanders*).) However, just as the CFCA's ultimate purpose is " ' "to protect the public fisc" ' " (*Wells, supra*, 39 Cal.4th at p. 1196), the FFCA is " 'designed to protect the Federal Treasury' " (*Hutchins, supra*, 253 F.3d at p. 183). Therefore, " '[o]nly those actions by the claimant which have the purpose and effect of causing the United States to pay out money it is not obligated to pay, or those actions which intentionally deprive the United States of money it is lawfully due, are properly considered "claims" with the meaning of the [FFCA].' " (*Id.* at p. 184.) Since the false claims in *Hutchins* would not "result in economic loss to the United States government, liability under the [FFCA did] not attach." (*Ibid.*)

Here as in *Hutchins*, the potential false claims asserted in the first cause of action—customers' use of inflated weight tags to obtain excessive CRV payments from Recology—could be considered actionable under the literal terms of the CFCA. Recology's buy-back centers are arguably a "state . . . program" within the CFCA's definition of a "claim." (Gov. Code, § 12650, subd. (b); see Pub. Resources Code, § 14501, subd. (a) [the California Beverage Container Recycling and Litter Reduction Act (Pub. Resources Code, § 14500 et seq.) is intended "to encourage increased, and more convenient, beverage container redemption opportunities for all consumers"]; Pub. Resources Code, § 14501, subd. (g) ["[t]he responsibility to provide convenient, efficient, and economical redemption opportunities rests jointly with manufacturers, distributors, dealers, recyclers, processors, and the Department of Conservation"].) And, while the record shows that the state reimburses Recology for CRV materials collected at the buy-back centers

based on the weight of the materials received and not the amounts paid to the customers, the state's weight-based reimbursements in effect reimburse Recology for at least a "portion of the money . . . requested or demanded" by the customers with inflated weight tags. (Gov. Code, § 12650, subd. (b).)

Nevertheless, if Recology does not use inflated customer weight tags to determine the weight of buy-back center materials reported to the state, and instead reports the correct weights as determined in some other manner, the inflated weight tags are not "a false record or statement material to a false or fraudulent claim" against the state. (Gov. Code, § 12651, subd. (a)(2).) The inflated weight tags are not false claims against the state as alleged in McVeigh's first cause of action because they do not "have the . . . effect of causing the [state] to pay out money it is not obligated to pay." (*Hutchins, supra,* 253 F.3d at p. 184.) The state payments for buy-back center CRV recyclables are based on the reported weight of those materials. If the weights are accurately reported, then the state pays no more than it is obligated to pay, and inflated weight tags are false claims only against Recology, not the state. Since the state suffers no financial loss because of the weight tag inflation as alleged in the first cause of action, McVeigh's investigation and reporting of that inflation was not protected conduct under the CFCA.

▇ The fact that the false weight tags injured Recology, a company that helps the government to achieve its recycling objectives, does not change our conclusion. There is a "distinction between whether a claim was made against the government and whether the government was injured by the alleged fraud. Unless . . . the former [is established], the latter is irrelevant." (*Sanders, supra,* 545 F.3d at pp. 259–260, fn. 4.) And, while we are called upon to broadly construe the CFCA's whistleblower provision, we must do so "consistent with [its] purpose," which is "to prevent fraud on the public treasury." (*Rapid Transit, supra,* 30 Cal.App.4th at p. 725.)

McVeigh argues for a different conclusion based on the decision in *Yesudian, supra,* 153 F.3d 731, but that case is distinguishable. The plaintiff in *Yesudian* worked in the purchasing department of Howard University. He repeatedly complained to senior university officials that the director of the department was guilty of financial improprieties, such as accepting bribes from vendors, and permitting payments to vendors who provided no services to the university. After the plaintiff's employment was terminated, he sued the university and three of his supervisors alleging submission of false claims in violation of the FFCA, and retaliation for reporting the alleged false claims. As relevant here, the court discussed whether the plaintiff engaged in protected conduct by reporting the alleged false claims even though they were presented only to the university, a grantee of federal funds, and not to the federal government itself. The government did not specifically reimburse

any of the payments to vendors, but provided grants for over 80 percent of the university's funding. The court suggested without deciding that claims against the university could be considered claims against the government, even though the claims were not resubmitted to the government for payment, because the claims were paid from funds the government had already given to the university.

The court wrote: "It may be that this reading—that a claim to a grantee is effectively a claim to the United States—should not apply to all grantees. It may not be appropriate, for example, where the grantee's federal funds are an insubstantial percentage of its total budget, where there is little likelihood that any of a defendant's money actually came from the federal grant, or where there is little continuing contact between the grantee and the government once the grant is made." (*Yesudian, supra,* 153 F.3d at p. 738.) The court emphasized legislative history indicating that " 'a false claim is actionable although the claims or false statements were made to a party other than the Government, *if the payment thereon would ultimately result in a loss to the United States.*' " (*Ibid.*) A claim on a grantee could be viewed as a claim on the government if there was "a sufficiently close nexus between the two such that a loss to the former is effectively a loss to the latter." (*Ibid.*)

*Yesudian* does not save McVeigh's first cause of action, for a number of reasons. First, the issue in *Yesudian* was how to evaluate a claim against a government grantee where the grantee does not seek reimbursement from the government. Here, Recology obtains reimbursement from the state, and the difference between the inflated claims Recology receives from customers and the correct claims it submits to the state is what dooms the first cause of action. Second, no showing has been made that Recology is a state-sponsored enterprise like the university was in *Yesudian.* No evidence establishes that the reimbursements Recology receives from the state for buy-back center recyclables are a substantial portion of its revenues. According to a Recology declaration, money paid to Tunnel Road buy-back center customers was only 2.4 to 3 percent of Recology's overall expenses in 2007 and 2008. Under the scenario posited in the first cause of action, the reimbursements from the state would be less than the payments to the customers because the customers are paid for inflated weights while the state reimburses only for the correct weights. Third, *Yesudian* affirms the basic principle that a false claim is not actionable unless it would ultimately result in a loss to the state. But under McVeigh's first cause of action Recology was the only loser.

Summary judgment was correctly granted to Recology on McVeigh's first cause of action.

(3) *Second Cause of Action*

McVeigh's second CFCA cause of action, unlike his first, did not preclude the possibility of financial harm to the state due to weight tag inflation. Whereas the first cause of action, as we have said, was limited to false claims against Recology, the second cause of action alleges that Recology "presented false claims to the state."

(a) *Protected Conduct*

The parties' arguments on the second cause of action focus on whether Recology used inflated customer weight tags to determine the weight of materials reported to the state that qualified for reimbursement at the higher buy-back center rate, such that false claims against the state actually occurred. The reimbursements Recology received were based on the DR-6 forms it delivered to the purchasers of its CRV recyclables and the DR-7 forms the purchasers prepared that verify the weight of the materials they received from Recology. Since Recology commingled the recyclables from the buy-back centers with CRV recyclables it got from other sources before it sold them, the purchaser could only verify a shipment's total weight, not the weight from particular sources of the materials. In order to discern the amount owed Recology for CRV at the buy-back center rate, the state had to rely on Recology's DR-6 form. If the buy-back center portion of the shipment as shown on the form was based on inflated tag weights, Recology would receive an excessive refund.

As evidence that the weight Recology reported for buy-back center materials was based on the weight tags generated when those materials were received from customers, McVeigh cited testimony of Pier 96 operations manager Damele. The transcript of Damele's deposition reads in relevant part: "Q. The weight of CRV material that gets shipped out of Pier 96 that's gone through the Recycle [Buy-back] Center gets reported to the State, correct? [¶] A. Yes. [¶] Q. Where is it determined by the company what the weight is that got shipped out that went through the Recycle Center? [¶] A. Through the tags that they received from buying the material from the public. [¶] Q. So the company looks at the front end of the Recycle Center where the customers brought in their cans and bottles, looks at that information, totals it up, and then reports to the company [*sic:* presumably, the state], here's the amount of recycle material we got? [¶] A. To my understanding, yes."

Recology has said a couple of different things about the basis for its claims to the state for CRV reimbursement. In its respondent's brief, and in the trial court, Recology said that the weights it reported to the state for reimbursement were not based on the weight tags. Recology claimed that "payments

from the State are based on the weight of CRV material that has been baled and weighed in that state, not by adding up the weight tags prepared for each individual customer at the Buyback Centers." However, the record did not bear out those assertions, and Recology moved away from them in a supplemental respondent's brief.

Recology acknowledges in its supplemental brief that Damele's testimony, "[c]onstrued in McVeigh's favor . . . states that Recology used weight tags prepared at Pier 96 to report the weight of CRV material collected at the Pier 96 Buyback Center." However, Recology goes on to argue that this fact makes no difference in the outcome because the record is silent as to how the weight of recyclables purchased at the Tunnel Road facility was reported to the state. It is unclear whether the same practices for reimbursement of redeemed recyclables were used at Tunnel Road and Pier 96, but this uncertainty at least creates a factual question and is not fatal to McVeigh's second cause of action.

As we have said in our discussion of the first cause of action, we disagree with the parties' apparent assumption that the CFCA only protects whistle-blowers who discover an actual, rather than possible, false claim. *Yesudian* and *Hutchins* are illustrative. The *Yesudian* court assumed without deciding that the plaintiff never found evidence of a necessary element of his false claims action (*Yesudian, supra,* 153 F.3d at p. 741), but nevertheless reversed a judgment for the defendant on the plaintiff's retaliation claim (*id.* at p. 748). "[T]here is no requirement that to be protected, a plaintiff must have gathered all of the evidence [for a qui tam suit] by the time of the retaliation. Indeed, if there were, the failure of Yesudian's . . . qui tam claim would alone have warranted judgment as a matter of law on his retaliation claim"—but it did not. (*Id.* at pp. 740–741.) In *Hutchins,* the court determined that the plaintiff's qui tam action lacked merit (*Hutchins, supra,* 253 F.3d at pp. 182–185), but that holding was not dispositive of the plaintiff's retaliation claim, which the court went on to discuss at length after explaining why the qui tam action failed (*id.* at pp. 185–195).

■ According to the *Kaye* case, to engage in protected conduct, "the employee must have reasonably based suspicions of a false claim and it must be reasonably possible for the employee's conduct to lead to a false claims action." (*Kaye, supra,* 179 Cal.App.4th at p. 60.) That a false claims action must be "reasonably possible" simply means. that there must a reasonable basis for the employee's suspicion about fraud on the government—not that actual grounds for a false claims action must have existed. (See *LeVine v. Weis* (2001) 90 Cal.App.4th 201, 210 [108 Cal.Rptr.2d 562] [plaintiff "need only

show that he had reasonably based suspicions of a false claim"].)[5] Federal cases are in accord with this standard. The court in *Fanslow v. Chicago Manufacturing Center, Inc.* (7th Cir. 2004) 384 F.3d 469, 480 (*Fanslow*), for example, "agree[d] with several of our sister circuits, which have held that the relevant inquiry to determine whether an employee's actions are protected under [the FFCA] is whether: '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.' "

As for whether McVeigh subjectively and in good faith believed that the government was being defrauded, Recology notes that he referred in his EthicsPoint presentation to what he called "embezzlement" of Recology funds through inflated weight tags, but did not mention that such embezzlement caused any loss to the state. For purposes of summary judgment, however, we must credit McVeigh's declaration that states he was concerned about fraud on the government as well as fraud on Recology.

As for whether his concerns about the government fraud were objectively reasonable, McVeigh effectively conceded in his declaration that he did not know, when he was reporting on weight tag inflation, precisely how Recology obtained reimbursement from the state for CRV payments at the buy-back centers. He did not learn until Damele's deposition that Recology used "customer counter weights" in reporting the weight of buy-back center recyclables to the state. But when he was blowing the whistle on inflated weight tags McVeigh was aware that Recology reported the weight of buy-back center recyclables to the state on DR-6 forms, he had been told that "the State reimbursed the company for our CRV payments," and he knew that reimbursements for recyclables purchased at the buy-back centers were higher than for those collected curbside. A trier of fact could find from this evidence that McVeigh had reasonable grounds to suspect that the state, as well as Recology, would be harmed by the weight tag fraud, and thus that he engaged in protected conduct under the CFCA when he sounded the alarm. (See *Fanslow, supra,* 384 F.3d at pp. 480–481[reversing summary judgment for employer where it was unclear whether plaintiff "understood, or should have understood" facts negating any false claim, and the evidence did not establish that plaintiff "was unreasonable to think [employer] might be committing fraud on the government"].)

Damele's testimony that Recology used weight tags to report the weight of Pier 96 buy-back center recyclables to the state showed that weight tag inflation could in fact harm the state. But while that testimony provided additional evidence to support McVeigh's case, McVeigh's declaration was

---

[5] In light of our conclusion, we deny McVeigh's request to take judicial notice of pleadings in his qui tam case against Recology. They are irrelevant to this appeal.

alone sufficient to raise an issue of fact over whether he was engaged in protected conduct. (Cf. *Hutchins, supra,* 253 F.3d at pp. 189 [protected conduct is an "intensely factual" issue].) McVeigh's case for protected activity does not stand or fall on whether Recology actually reported inflated weights to the state for materials purchased at either of its buy-back centers, or whether it used the weight tags to seek reimbursement for recyclables redeemed at Tunnel Road.

Recology was not entitled to summary judgment on McVeigh's second cause of action on the ground that he did not engage in protected activity.[6]

### (b) *Recology's Knowledge of the Protected Activity*

■ The trial court granted summary judgment on the second cause of action on the ground that McVeigh was merely doing his job in blowing the whistle on weight tag inflation. This ruling rested on federal cases indicating that an employer lacks knowledge of an employee's protected conduct as required for an FFCA retaliation claim if it is not put on notice of the "distinct possibility of [FFCA] litigation." (E.g., *Hutchins, supra,* 253 F.3d at p. 188.) There is a species of employees recognized in FFCA cases as " 'fraud-alert' employee[s]" (*Fanslow, supra,* 384 F.3d at p. 484) "who are charged with discovering fraud in the normal course of their job duties" (*id.* at p. 483) and are subject to a "heightened notice standard" (*ibid.*). "This is because of the common sense notion that when an employee whose very job is to root out problems with government claims does, in fact, present problematic findings, his employer believes he is doing his job, not warning of a lawsuit." (*U.S. et al. ex rel. John Stone v. OmniCare, Inc.* (N.D.Ill., July 7, 2011, No. 09 C 4319) 2011 U.S.Dist. Lexis 73123, p. *20.) "[I]f an employee is assigned the task of investigating fraud within the company . . . the employee must make it clear that the employee's actions go beyond the assigned task." (*Eberhardt v. Integrated Design & Construction, Inc.* (4th Cir. 1999) 167 F.3d 861, 868 (*Eberhardt*).)

---

[6] McVeigh's second cause of action alleges that false claims were made on the City and County of San Francisco as well as the state. This allegation is based on a theory that Recology can seek a rate increase because its operating expenses increased as a result of the fraud. Having concluded that McVeigh could be found to have engaged in protected conduct based on a reasonable belief that false claims were being made against the state, we need not determine whether the second cause of action may be viable for the additional reason that false claims were being made against San Francisco. Moreover, McVeigh improperly attempts to explain his San Francisco theory for the first time in his reply brief (see, e.g., *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 [67 Cal.Rptr.2d 350]), and the only evidence on the point is a Recology declaration stating that any effect of weight tag inflation on the rate setting process is "prohibitively speculative." For all of these reasons, we decline to reach McVeigh's claim that he reasonably believed that San Francisco was also being defrauded.

A fraud-alert employee imparts knowledge of his or her protected activity "by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility." (*Eberhardt, supra,* 167 F.3d at p. 868.) "It would not be enough to 'simply report [the] concern of a mischarging to the government to [one's] supervisor,' [citation], nor would it be enough to investigate 'nothing more than [the] employer's non-compliance with federal or state regulations.' [Citation.]" (*Ibid.*) But the requisite notice could be provided by reports of malfeasance the employee describes as "illegal or fraudulent" (*ibid.*), or by threats to report the misconduct to government officials (see *U.S. ex rel. Ramseyer v. Century Healthcare Corp.* (10th Cir. 1996) 90 F.3d 1514, 1523 (*Ramseyer*)).

McVeigh does not dispute that deterring fraud was part of his job at the buy-back center, but he argues that the federal fraud-alert standard does not apply in California. He relies on cases involving public employees, who by statute can attain whistleblower protection merely by reporting wrongdoing to their supervisors in the normal course of their duties. (See *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1312–1313 [130 Cal.Rptr.2d 347]; *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 856–858 [136 Cal.Rptr.3d 259] [discussing *Colores* and *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1385–1386 [37 Cal.Rptr.3d 113] (*Patten*); Lab. Code, § 1102.5, subd. (e)].) But the cases he relies upon are distinguishable because Recology is a private employer. These authorities are inapposite.

*Rapid Transit, supra,* 30 Cal.App.4th 713, the case on which McVeigh primarily relies, is distinguishable for the same reason (see *id.* at p. 724, fn. 9 [transit district employer was a local governmental entity]), and more. The plaintiffs there were fraud-alert employees who were fired after reporting criminal conduct in connection with a false claim to the district's inspector general, and to the local sheriff and district attorney. The trial court denied the district's motion for summary judgment on a cause of action for wrongful termination in violation of public policy "based on the finding of a 'possible violation' of [the whistleblower provisions of the CFCA]." (*Id.* at p. 723.) The Court of Appeal affirmed, noting as relevant here that the plaintiffs "not only reported to their superiors at the District, but also to several law enforcement agencies. Those reports to outside law enforcement agencies . . . are alleged to be the principal reasons which caused [the inspector general] to terminate plaintiffs." (*Id.* at p. 725.) The court did not discuss the employer knowledge element of a CFCA retaliation claim, or consider the heightened notice required from fraud-alert employees under the federal cases. Application of the federal standard would not have changed the result in *Rapid Transit,* because the plaintiffs' reporting of illegal conduct to the employer and law enforcement provided adequate notice of possible litigation under the

federal standard. (*Eberhardt, supra,* 167 F.3d at p. 868; *Ramseyer, supra,* 90 F.3d at p. 1523.) Thus, *Rapid Transit* cannot be taken to reject the federal authority.

We are persuaded by the federal cases that hold fraud-alert employees should be held to a heightened notice standard, but agree with McVeigh that he could be found to have met it. Like the plaintiffs in *Rapid Transit,* he reported his suspicions of fraud to law enforcement as well as to Recology and he did so using terms like "embezzlement" which should impart notice of potentially illegal malfeasance. (*Eberhardt, supra,* 167 F.3d at p. 868; *Ramseyer, supra,* 90 F.3d at p. 1523.)[7] Reports to law enforcement were unquestionably protected conduct under Government Code former section 12653, subdivision (b) because that statute, unlike the FFCA, expressly protected such reports. McVeigh took his concerns about weight tag inflation all the way to Recology's board of directors. He secured an offer from the police to investigate the matter, which Recology declined to pursue. The evidence raises at least a triable issue whether Recology would have thought that McVeigh, in taking all of these actions, was merely doing his job and not warning of possible litigation. Summary judgment on the second cause of action cannot be justified on the ground that Recology had no knowledge of McVeigh's protected activity.

### (c) *Discrimination Because of Protected Conduct*

The trial court granted Recology summary judgment on the second cause of action on the additional ground that McVeigh could not satisfy the third element of his CFCA cause of action and show that his employment was terminated because of his protected activity. The court reasoned that there was no causal link between his termination and the protected activity because he was not terminated until almost three years after he first began reporting on tag inflation.

McVeigh initially reported tag inflation at Pier 96 in 2005, and he was not fired until 2008. However, McVeigh declared that he was ordered in January 2006, after his transfer to Tunnel Road, to ignore tag inflation, and that he

---

[7] According to Recology, McVeigh has "admitted that Recology *wanted* supervisors like him to call law enforcement to address Buyback issues." But the "Buyback issue" that Recology cites from McVeigh's declaration referred to customers robbing each other while in line at the buy-back center, not possible fraud on the state.

McVeigh's declaration does not, as Recology would have it, establish as an "undisputed fact that McVeigh's reports to law enforcement were part of his job duties" insofar as those reports involved tag inflation. In any event, as our discussion of the federal cases has shown, a fraud-alert employee's reports to law enforcement can put the employer on notice that a false claims action is a " 'distinct possibility' " (*Hutchins, supra,* 253 F.3d at p. 188), even if the reports are part of the employee's job.

followed that order until September 2007, when he was put in charge of the Tunnel Road buy-back center. At that point he renewed his investigation and reporting of tag inflation, and brought the matter to the attention of the board of directors in February 2008. He was fired three months later in May, after rocking that boat.

■ On this record it is possible that much less than three years elapsed between McVeigh's protected conduct and Recology's alleged retaliation. The gap could be viewed as eight months, from September 2007 to May 2008, or three months, from February 2008 to May 2008—relatively brief intervals that could support an inference of causation. (See *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69 [105 Cal.Rptr.2d 652] [causal link may be established by circumstantial evidence such as proximity in time between protected activity and alleged retaliation].) Moreover, McVeigh has presented direct as well as circumstantial evidence that he was terminated for his whistleblowing activities. He has declared that, just three months before he was terminated, his supervisor called him into a supply room, locked the door and told him that he could be fired if he pressed on with his concern about possible CRV fraud. The court erred in finding that causation was not a triable issue.

The court erred when it found McVeigh could not state a prima facie case because there was no causal link between his termination and his whistle-blowing activities. The summary judgment for Recology on the second cause of action must be reversed.

## C. *Labor Code Cause of Action*

■ McVeigh's fourth cause of action alleges that his employment was terminated in violation of Labor Code section 1102.5, subdivision (b), "California's general whistleblower statute" (*Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922, 933 [56 Cal.Rptr.3d 262]), which provides: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." "This provision reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fear-ing retaliation." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 77 [78 Cal.Rptr.2d 16, 960 P.2d 1046] (*Green*).) To establish a prima facie case of retaliation, the plaintiff "must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." (*Patten, supra,* 134 Cal.App.4th at p. 1384.)

McVeigh states in his declaration that he reported "CRV fraud and theft" at Tunnel Road to Police Sergeant Lynn from December 2007 "through the spring of 2008 up until I was fired in May of 2008." He explained to Lynn his "concerns of fraudulent CRV weight tag inflation theft and the resulting kickbacks for the fraudulent payments, and that the CRV money was money from the State." Lynn testified that he had "[a]t least half a dozen" conversations with McVeigh about "employee theft" at Recology. McVeigh informed "management, specifically Mr. Stewart and on occasion Mr. Crosetti," of his contacts with Lynn.

The court granted summary judgment on the Labor Code section 1102.5, subdivision (b) cause of action on the same grounds it relied upon for the summary judgment on the CFCA causes of action; namely that McVeigh's activity was not protected because he was merely performing his regular job responsibilities in reporting the "CRV fraud and theft" to law enforcement, and that his termination was too distant in time from his initial report to the police to support an inference of causation. Neither rationale justifies summary judgment on the Labor Code cause of action. As we have said, McVeigh was not necessarily just doing his job in reporting to law enforcement. (See fn. 7, *ante*.) An employee's report of illegal activity can, in any event, constitute protected conduct under Labor Code section 1102.5, subdivision (b) even if she " 'was simply doing her job' " in making the report. (*Patten, supra*, 134 Cal.App.4th at p. 1386.) The argument against causation based on the length of time between the protected conduct and the alleged retaliation fails for the same reasons it fails on the CFCA cause of action.

"An employee engages in protected activity [under Labor Code section 1102.5, subdivision (b)] when she discloses to a governmental agency ' "reasonably based suspicions" of illegal activity.' " (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 138 [68 Cal.Rptr.3d 568].) McVeigh clearly had a reasonable basis for suspecting tag inflation fraud because Recology employees had been caught doing it. Recology argues that McVeigh's conduct was not protected by Labor Code section 1102.5, subdivision (b) because the statute extends protection only for reports of illegal activity by a plaintiff's employer, not the plaintiff's fellow employees. This argument is based on portions of an uncodified preamble to 2003 amendments to Labor Code section 1102.5, which "add[ed] a number of whistleblower-related provisions and additional penalties" (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 329, fn. 5 [25 Cal.Rptr.3d 320, 106 P.3d 976]). (Stats. 2003, ch. 484, § 2, pp. 3518–3519.) The legislation amended Labor Code section 1102.5, subdivision (b), but that subdivision "remain[ed] substantively the same." (*Patten, supra*, 134 Cal.App.4th at p. 1381.)

The preamble on which Recology relies reads in relevant part: "The Legislature finds and declares that *unlawful activities of private corporations* may result in damages not only to the corporation and its shareholders and investors, but also to employees of the corporation and the public at large. The damages caused by unlawful activities may be prevented by the early detection of *corporate wrongdoing.* The employees of a corporation are in a unique position to report *corporate wrongdoing* to an appropriate government or law enforcement agency. [¶] The Legislature finds and declares that it is the public policy of the State of California to encourage employees to notify an appropriate government or law enforcement agency when they have reason to believe *their employer* is violating laws enacted for the protection of corporate shareholders, investors, employees, and the general public." (Stats. 2003, ch. 484, § 1, pp. 3517–3518, italics added.)

While the italicized language in this preamble exhibits the Legislature's intent to deter employer misconduct, it cannot properly be read to limit the reach of Labor Code section 1102.5, subdivision (b) to reports of employer misbehavior. The statute by its terms protects reports of unlawful conduct, and it was not interpreted prior to the 2003 amendment to be limited to unlawful conduct on the part of a plaintiff's employer. *Gardenhire v. Housing Authority* (2000) 85 Cal.App.4th 236, 237–240 [101 Cal.Rptr.2d 893] (*Gardenhire*), upheld a judgment under the statute for a plaintiff who blew the whistle on illegal activity by a fellow employee and a contractor of her employer. (Cf. *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 670, fn. 10 [254 Cal.Rptr. 211, 765 P.2d 373] [citing Lab. Code, § 1102.5, subd. (b) in the context of an employee's reporting of information concerning other employees].) The 2003 amendments made no substantive change to Labor Code section 1102.5, subdivision (b), and do not call *Gardenhire* into question. To the contrary, the amendments added a new subdivision (e) to Labor Code section 1102.5, which codified *Gardenhire*'s holding that a report to a government employer constitutes a disclosure to a government or law enforcement agency within the meaning of subdivision (b). (*Patten, supra,* 134 Cal.App.4th at p. 1385.)

Recology argues that the *Patten* case supports its narrow reading of Labor Code section 1102.5, subdivision (b), but we disagree. The plaintiff in *Patten* was the principal of a public school who alleged that she was subjected to adverse employment action for reporting improprieties to the school district. She reported among other things that female students were complaining that a male physical education teacher was peering into the girls' locker room. "[She] disclosed this information to her district superiors for personnel action." (*Patten, supra,* 134 Cal.App.4th at p. 1382.) The plaintiff also reported that a male science teacher had made an offcolor remark to a female student. "Again, [she] disclosed this information to her superiors for personnel action." (*Ibid.*)

The court held that "[t]he disclosures involving the two teachers do not amount to whistleblowing [under Labor Code section 1102.5, subdivision (b)] as a matter of law because, although the disclosures were made by a government employee [the principal] to a government agency [the school district], the disclosures indisputably encompassed only the context of *internal personnel matters* involving a supervisor and her employee, rather than the disclosure of a legal violation." (*Patten, supra,* 134 Cal.App.4th at pp. 1384–1385.) The court reasoned: "To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site." (*Id.* at p. 1385.)

*Patten* is distinguishable because McVeigh did not merely refer the employees he suspected of tag inflation fraud to his superiors for personnel action within Recology. He took his reports to law enforcement, and they were reports of illegal conduct not just "internal [Recology] personnel matters." (*Patten, supra,* 134 Cal.App.4th at p. 1385, italics omitted.) Moreover, the court in *Patten* would not have needed to explain why the judiciary should avoid micromanaging internal personnel matters if, as Recology posits, Labor Code section 1102.5, subdivision (b) is aimed solely at employer misconduct.

■ Labor Code section 1102.5, subdivision (b) should be given a broad construction commensurate with its broad purpose (*Green, supra,* 19 Cal.4th at p. 77). ■ We conclude, consistent with the statute's application in the *Gardenhire* case, that Labor Code section 1102.5, subdivision (b) protects employee reports of unlawful activity by third parties such as contractors and employees, as well unlawful activity by an employer. In support of our conclusion, we note that an employer may have a financial motive to suppress reports of illegal conduct by employees and contractors that reflect poorly on that employer.

Accordingly, McVeigh's reports of employee tag inflation fraud to Sergeant Lynn were protected activity. McVeigh apprised Recology of the protected activity, and neither the timing nor circumstances of his termination preclude a finding that the termination was due to his reports to law enforcement. Recology was not entitled to summary judgment on the fourth cause of action on the ground that McVeigh could not establish a prima facie case of

retaliation in violation of Labor Code section 1102.5, subdivision (b). (*Patten, supra,* 134 Cal.App.4th at p. 1384.)[8]

## D. *Wrongful Termination in Violation of Public Policy*

"[W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action . . . ." (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330] (*Tameny*). McVeigh indicated in the trial court that his third cause of action, for wrongful termination in violation of public policy, was "based upon the same factual grounds as his causes of action under the [C]FCA and Labor Code section 1102.5." The trial court found that McVeigh's *Tameny* claim failed because his whistleblower causes of action under the CFCA and the Labor Code lacked merit.

Our reversal of the summary judgment against McVeigh on his second CFCA cause of action resurrects his *Tameny* cause of action. (*Rapid Transit, supra,* 30 Cal.App.4th at pp. 723–725 [defendants were properly denied summary judgment on plaintiffs' *Tameny* claims where plaintiffs could show that they were terminated in violation of the CFCA whistleblower statute]; see *Hill v. Booz Allen Hamilton, Inc.* (D.Guam, Nov. 16, 2011, Civ. Case No. 07-00034) 2011 U.S.Dist. Lexis 132287, pp. *38–*39 [denying defense motion for summary judgment on plaintiff's *Tameny* claim where evidence disclosed a possible violation of the FFCA whistleblower statute].) "Fundamental public policy prohibits the retaliatory discharge of employees for whistle blowing in the public interest" (*Colores v. Board of Trustees, supra,* 105 Cal.App.4th at p. 1300, fn. 1), and "clearly forbids retaliatory action against an employee who discloses to a government agency the employer's misappropriation of public funds" (Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2011) ¶ 5:76, pp. 5-12 to 5-12.1 (rev. # 1, 2010) (Chin)). The plaintiff "need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity." (*Green, supra,* 19 Cal.4th at p. 87.) As we have said, McVeigh could be found to have reasonably suspected that weight tag inflation resulted in false claims on the state.[9]

---

[8] Since we conclude that McVeigh has a prima facie case under Labor Code section 1102.5, subdivision (b) based on his reports to law enforcement of weight tag inflation, we need not decide whether the cause of action is also viable because of his reports of marijuana scavenging by Recology employees.

[9] Because reversal of the summary judgment on the second CFCA whistleblower cause of action alone dictates reversal of the summary judgment on the *Tameny* claim, we need not decide how the *Tameny* claim is affected by our revival of the whistleblower cause of action under Labor Code section 1102.5, subdivision (b). But we note that while a report to law enforcement of fraud on Recology alone would support the Labor Code cause of action, such a report would not support a *Tameny* claim because the fraud "affect[ed] only the employer's . . .

The court erred in granting Recology summary judgment on the third cause of action.

## E. *Discovery Issues*

### (1) *Introduction*

Attorney Dipanwita Amar was retained by Recology to investigate McVeigh's "EthicsPoint" report. In the course of her investigation, Amar interviewed McVeigh and Recology managers. Amar enlisted help from accountants, and she and the accountants took notes during the interviews. McVeigh sought discovery of the notes and the names of the witnesses interviewed. McVeigh advises in his briefing that his motion to compel was denied without a written order. He argues that the motion should have been granted.

Recology's threshold response is that this contention has been waived because McVeigh did not include the reporter's transcript of the hearing on the motion in the record on appeal. However, it appears from our review of the briefing that no oral argument on the motion occurred. McVeigh advises that "Recology's attorney called to contest the motion but failed to appear so the matter was taken under submission without argument." The record establishes no waiver.

### (2) *Notes from the Interviews*

Recology objected to production of the interview notes on the grounds that they were protected by the attorney-client privilege, or the attorney work-product doctrine. McVeigh's appellate argument on the point consists of one sentence, and citations to cases discussing work product. He says: "The statements of McVeigh and witnesses are nonderivative material and are discoverable. *Fellows v. Superior Court* (1980) 108 Cal.App.3d 55, 68–69 [166 Cal.Rptr. 274]; *People v. Williams* (1979) 93 Cal.App.3d 40, 63–64 [155 Cal.Rptr. 414]; [*Rodriguez*] *v. McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 647–648 [151 Cal.Rptr. 399]." McVeigh thus fails to address the attorney-client privilege argument raised below.

"A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." (9 Witkin, Cal.

---

interest, and not the general public's interest . . . ." (*Green, supra,* 19 Cal.4th at p. 75; see Chin, *supra,* ¶ 5:91, p. 5-14.1 (rev. # 1, 2009) ["no public policy is violated by discharging an employee for reporting that others are misappropriating the employer's funds (as distinguished from public funds . . .)"].)

Procedure (5th ed. 2008) Appeal, § 355, p. 409.) Since the record is silent on the reasons discovery of the interview notes was denied, we can presume that the decision was made solely on the ground of attorney-client privilege. Since McVeigh has demonstrated no error as to that ground, we affirm the ruling on discovery of the notes.

### (3) *Identities of Those Interviewed*

 Recology objected to discovery of the witness list solely under the work-product doctrine. Recology argued, and McVeigh did not dispute, that *Nacht & Lewis Architects, Inc. v. Superior Court* (1996) 47 Cal.App.4th 214 [54 Cal.Rptr.2d 575] (*Nacht*), "establishe[d] the law in California regarding work product protection of witness identities." *Nacht* addressed form interrogatory No. 12.3, which asks for the names of witnesses from whom written or recorded statements have been obtained. (See *Coito v. Superior Court* (2012) 54 Cal.4th 480, 500 [142 Cal.Rptr.3d 607, 278 P.3d 860] (*Coito*).) *Nacht* held that a list of witnesses from whom counsel took recorded statements at his or her own initiative constituted qualified work product "because it would tend to reveal counsel's evaluation of the case by identifying the persons who claimed knowledge of the [facts] from whom counsel deemed it important to obtain statements." (*Nacht*, at p. 217.) Qualified work product "is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice." (Code Civ. Proc., § 2018.030, subd. (b).)

This holding in *Nacht* was significantly limited in *Coito*, where the court wrote: "Because it is not evident that form interrogatory No. 12.3 implicates the policies underlying the work product privilege in all or even most cases, we hold that information responsive to form interrogatory 12.3 is not automatically entitled as a matter of law to absolute or qualified work product privilege. Instead, the interrogatory usually must be answered. However, an objecting party may be entitled to protection if it can make a preliminary or foundational showing that answering the interrogatory would reveal the attorney's tactics, impressions, or evaluation of the case, or would result in opposing counsel taking undue advantage of the attorney's industry or efforts. Upon such a showing, the trial court should then determine, by making an in camera inspection if necessary, whether absolute or qualified work product protection applies to the material in dispute." (*Coito, supra*, 54 Cal.4th at p. 502.)

Because the discovery issue here was not argued under the standards now established by *Coito*, reversal of the ruling on the witness list is required. If McVeigh chooses to renew his motion to compel production of the witness list, the motion can be resolved in accordance with *Coito*.

## III. DISPOSITION

The judgment for Recology on the second, third, and fourth causes of action is reversed. The judgment for Recology on the first and fifth causes of action is affirmed. The ruling on the discovery motion is vacated insofar as the motion sought the names of witnesses interviewed by attorney Amar and the accountants who assisted her, and affirmed insofar as the motion sought the notes taken during those interviews. Costs on appeal to McVeigh.

McGuiness, P. J., and Jenkins, J., concurred.