Filed 6/1/21  Brown v. Dept. of Corrections etc. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JADA BROWN,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>DEPARTMENT OF CORRECTIONS AND REHABILITATION et al.,<br><br>　　　Defendants and Respondents. | A158715<br><br><br>(Marin County<br>Super. Ct. No. CIV1702421) |

This is an appeal from judgment after the trial court granted the motion for summary judgment filed by defendant California Department of Corrections and Rehabilitation (CDCR) in a wrongful termination lawsuit brought by its former employee, plaintiff Jada Brown.  On appeal, plaintiff challenges the trial court's findings on summary judgment that she failed to make a prima facie case of retaliation or race discrimination.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 15, 2010, plaintiff was hired as a recreation therapist at San Quentin State Prison (San Quentin).  Plaintiff was assigned to work on the recidivism team with a mental health unit at San Quentin.  In this capacity, plaintiff arranged therapeutic recreation activities for inmates on death row or in administrative segregation.  Her supervisor was Dr. Christopher Roach.

1

In 2011, plaintiff was transferred to the crisis treatment center (CTC), a new medical unit at San Quentin, which was in need of a therapist to provide recreational therapy to some of the prison's most mentally ill inmates. Plaintiff's new supervisor was chief medical officer Dr. Elena Tootell.

In October 2011, plaintiff made a complaint to Sheila D., a union representative, regarding work-related issues. Specifically, she complained about not having proper supervision or basic supplies to perform her duties, including computer access, paper, markers, or therapeutic holding cages for meeting with her inmate patients.

Sometime in 2012, plaintiff made a complaint to T.F., a labor relations officer, regarding an incident with a CTC staff member, Angel L., who allegedly yelled at plaintiff, called her insubordinate, and "forced her to violate HIPPA [*sic*] laws" by sliding inmate files under the office door of a colleague.[1]

Also in September 2012, plaintiff made a complaint to Barbara Brown, an employee relations officer. Plaintiff again complained about her lack of proper supervision and inadequate supplies. In addition, plaintiff claimed that she had been improperly transferred to CTC without being given a new job description, had her Internet access removed, and was denied a raise.

On October 9, 2012, several correctional officers and prison staff members witnessed plaintiff allowing an inmate (Inmate 1) to speak to his attorney and mother on a state-owned speaker phone in violation of CDCR policies. Plaintiff admitted placing a call to Inmate 1's attorney on his behalf

---

[1] "HIPPA" appears to be a reference to the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA). (Pub.L. No. 104-191 (Aug. 21, 1996) 110 Stat. 1936.)

that lasted about 10 minutes and a call to his mother that lasted about 15 minutes. Officer Stragalinos came into the room and overheard the call. Officer Stragalinos then left the room and asked Officer Edwards whether plaintiff obtained authorization for the calls. Officer Edwards said she did not. When Officer Edwards returned to the room, plaintiff falsely stated that she received authorization from a CTC supervisor. Plaintiff then repeated this false statement to Dr. Tootell and others. When later questioned about this incident, the CTC supervisor confirmed that she did not authorize plaintiff to allow Inmate 1 to make the calls and that she previously instructed plaintiff not to allow Inmate 1 telephone calls.

The next day, October 10, 2012, plaintiff was reprimanded by Dr. Pratt that the calls with Inmate 1 were inappropriate. Dr. Pratt also warned plaintiff that she would be removed from her normal duties and reassigned to the dental division pending an investigation into the incident.

On November 5, 2012, Dr. Tootell reported to the employment relations office additional information regarding plaintiff. This report stated: "Jada Brown had a verbal altercation with a clerical person in the CTC. Upon questioning both Jada and the other employee, it was found that Jada had approached the CTC inmate porter, and told the inmate that the porter was 'hot' and the clerical employee had a 'crush on him.' After the ensuing altercation, I verbally counseled Jada on appropriate conversations with inmates and maintaining a level of professionalism. At that time, I urged Jada to 'refrain from speaking with the inmate workers in the CTC unless it involves cleaning. This conversation occurred on July 27th, 2012. [¶] . . . [¶] Jada was placed on administrative duties in October of 2012. After Jada had cleaned out her desk, Standards and Compliance Coordinator [Diana M.] found a large stack of papers with patient protective identifiers."

3

On November 7, 2012, Andrew W. Deems, San Quentin's chief executive officer for healthcare, was notified in a memorandum from chief nursing executive Antonio Laureano that plaintiff placed two phone calls on behalf of an inmate and with the inmate present without proper authorization. Due to the seriousness of the allegation, Deems ultimately directed that plaintiff was to be reassigned to administrative offices where she would not have regular inmate contact pending an internal investigation by the office of internal affairs (OIA). At that time, Deems had no knowledge that plaintiff had made any complaints to CDCR officials or union representatives regarding various work-related issues.

On March 1, 2013, while the OIA's investigation was ongoing, Dr. Tootell wrote a memorandum recommending that plaintiff, who was still working in the dental division, not be certified for a salary adjustment because she was under investigation for overfamiliarity and had been redirected from clinical duties to administrative duties. On March 14, 2013, plaintiff then complained about not getting a pay raise.

On October 30, 2013, plaintiff filed a union grievance stating that she was working out of her job classification without receiving a commensurate pay increase.

In March 2014, the OIA's investigation into plaintiff's alleged misconduct, ordered by Deems on November 7, 2012, finally closed. The OIA found that plaintiff violated CDCR rules, policies, or regulations as follows: (1) In or about 2012 plaintiff was overly familiar with Inmate 1 while he was housed at CTC. She placed calls to his attorney and to his mother on his behalf and allowed him to place calls to his mother without authorization in violation of San Quentin policies, and was then dishonest about having done

4

so.[2]  (2) In 2012, plaintiff retained over 200 confidential inmate patient records in her work area that should have been stored in confidential files. She removed confidential inmate patient records from San Quentin, took them home, and refused an order to return all of them.  (3) Finally, plaintiff was dishonest and willfully insubordinate and disobedient during the OIA's investigation when she, among other things, repeatedly failed to comply with explicit instructions not to discuss her case with anyone without authorization, except for her representative.[3]

On April 15, 2014, plaintiff filed a grievance with CDCR stating that she was unfairly denied her merit-based pay increase due to an improper performance evaluation.[4]

On May 22, 2014, plaintiff wrote an email to five CDCR colleagues, Nathaniel A., Adeaner M. (her supervisor), Eric M., Barbara Brown, and Rachel N., in which she raised work-related concerns such as having to perform tasks "out of class," not receiving proper supervision or training as to CTC policies, and not getting a pay raise due to a "false" performance

---

[2] A few days earlier, after having been told not to allow Inmate 1 telephone calls or to be overly familiar with inmate porters, plaintiff received from Inmate 1 the name of his attorney and then looked up the attorney's contact information online.

[3] The OIA found that plaintiff's misconduct violated the following CDCR rules, regulations, policies, or procedures (among others):  Department Operations Manual (DOM), ch. 5, art. 21, § 52060.3, Use of Intrainstitution Telephone by Inmates; DOM, ch. 1, art. 12, §§ 12070.1, 12070.3, Telephone; Operational Procedure 1073, Telephone Access; SQ-Correctional Treatment Center Policy, CTC Inmate Privileges; Cal. Code Regs., tit. 15, § 3282, Use of Telephones by Inmates; DOM, ch. 3, art. 22, § 33030.3.1, Code of Conduct; Cal. Code Regs., tit. 15, § 3391, Employee Conduct; DOM, § 31140.38, Confidentiality of Investigations.

[4] On March 3, 2014, Brown's supervisor, Cheri Smith, denied plaintiff a merit increase.

5

evaluation. Plaintiff also referenced her misconduct, claimed other employees brought "contraband" into San Quentin yet were not investigated, and complained about having been "discriminated against in so many ways."

On May 29, 2014, plaintiff complained in writing about not getting a pay raise and about "false" scrutiny of her work.

On July 1, 2014, based on the OIA's findings, Deems issued plaintiff a 56-page notice of adverse action placing her on administrative leave. Deems found particularly significant the incidents of plaintiff's dishonesty, explaining that "employees working at San Quentin State Prison who have regular interaction with inmates [must] be forthright and honest in their communications regarding occurrences at San Quentin involving inmates" and that "[d]ishonesty in this regard represent[ed] an unacceptable threat to the safety and security of prison personnel, as well as the inmates." A few weeks later, Deems terminated plaintiff's employment effective July 31, 2014. On August 28, 2014, following plaintiff's request for review, Deems upheld his decision.

In or about July 2015, plaintiff filed an employment discrimination complaint with the Department of Fair Employment and Housing (DFEH) and was issued a right-to-sue letter.

On July 5, 2017, plaintiff filed the operative complaint, asserting causes of action for retaliation in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.), whistleblower retaliation in violation of Labor Code section 1102.5, and race discrimination.[5]

On August 24, 2018, following a period of discovery, CDCR moved for summary judgment. On October 31, 2018, plaintiff filed an opposition to this

---

[5] Plaintiff is African-American.

motion and objections to CDCR's evidence (including to Deems's declaration). Plaintiff's subsequent request for a continuance was granted, and both parties filed supplemental briefs as ordered by the court and additional evidentiary objections.

On August 19, 2019, following a contested hearing, the trial court granted CDCR's summary judgment motion. In doing so, the court found that CDCR met its burden of proving one or more of plaintiff's prima facie elements was lacking as to each cause of action, and that plaintiff failed her subsequent burden to raise a triable issue of fact in opposition. Judgment was entered in favor of CDCR, prompting this timely appeal.

## DISCUSSION

Plaintiff contends the trial court erred in finding on summary judgment that she failed to make a prima facie case of retaliation or race discrimination. According to plaintiff, multiple triable issues of material fact exist, including whether CDCR's stated reasons for terminating her were pretextual and whether she was actually terminated for her protected activity in (1) complaining about CDCR's failure to implement sufficient training and resources to comply with consent decrees that CDCR entered into in order to resolve federal lawsuits regarding its healthcare program and (2) complaining about her disparate treatment as compared to similarly situated non-African-American employees.

## I.     Standard of Review.

A motion for summary judgment shall be granted if all the evidentiary papers submitted and independently reviewed by the court show there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67 (*Morgan*).) A

7

defendant therefore "may move for summary judgment in an action or proceeding if it is contended that the action has no merit," including, for example, when the defendant contends the plaintiff cannot establish one of the essential elements of the action. (Code Civ. Proc., § 437c, subds. (a), (o)(1).) On appeal, "[w]e accept as true the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them. [Citation.] However, to defeat the motion for summary judgment, the plaintiff must show ' "specific facts," ' and cannot rely upon the allegations of the pleadings." (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805; see *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)

## II.     Retaliation Under FEHA and the Labor Code.

Plaintiff brought retaliation claims under both FEHA and Labor Code section 1102.5 based on allegations that CDCR dismissed her in retaliation for complaints she made to management and union representatives regarding various work issues and conditions, which she says were "protected activities" under these statutes.[6]

---

[6] FEHA bars an employer from taking any adverse employment action against an employee "because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Gov. Code, § 12940, subd. (h).)

Labor Code section 1102.5, subdivision (b) bars an employer from "retaliat[ing] against an employee for disclosing information . . . to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

To establish a prima facie case of retaliation under FEHA and Labor Code section 1102.5, the employee must show the following: (1) he or she was engaged in a protected activity, (2) the employer subjected the employee to an adverse employment action, and (3) a causal link exists between the protected activity and the employer's adverse action. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1125; *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 (*Patten*); *Morgan, supra*, 88 Cal.App.4th at p. 68.) Only if the employee makes this prima facie showing will the burden shift to the employer to identify a legitimate, nonretaliatory explanation for its adverse action. If the employer does so, the employee has the opportunity to show the employer's explanation is false or pretextual. (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 475–476; *Manavian v. Department of Justice* (2018) 28 Cal.App.5th 1127, 1141.)

Here, this burden shifting never occurred because the trial court found that plaintiff failed to establish a prima facie case. Specifically, while it was undisputed plaintiff's termination constituted an adverse action, the court found no evidence of a protected activity or a causal link between any protected activity and plaintiff's termination. We agree with this result.

A. *Protected Activity.*

"FEHA's stricture against retaliation serves the salutary purpose of encouraging open communication between employees and employers so that employers can take voluntary steps to remedy FEHA violations . . . ." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 475.) "Thus, protected activity takes the form of opposing any practices forbidden by FEHA or participating in any proceeding conducted by the DFEH or the Fair Employment and Housing Council (FEHC). (Cal. Code Regs., tit. 2, §§ 11002,

9

subds. (a), (b), 11021, subd. (a).)" (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 380 (*Nealy*).)  Relevant here, "[o]pposing practices forbidden by FEHA includes . . . opposing employment practices the employee reasonably believes to exist and believes to be a violation of FEHA; [or] participating in an activity perceived by the employer as opposition to discrimination. . . .  (Cal. Code Regs., tit. 2, § 11021, subd. (a)(1).)" (*Ibid.*)

"Although an employee need not formally file a charge in order to qualify as being engaged in protected opposing activity, such activity must oppose activity the employee reasonably believes constitutes unlawful discrimination, and *complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct.*" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1047, italics added, fn. omitted (*Yanowitz*).)

Similarly, under Labor Code section 1102.5, an employee engages in protected activity " 'when he or she discloses to a governmental agency " 'reasonably based suspicions' of illegal activity," ' " meaning a violation of or noncompliance with a state or federal statute, rule or regulation.  (*McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 468–469 (*McVeigh*).)  While the employee must have a reasonable belief that the disclosure involves a violation of or noncompliance with a statute, rule or regulation, "it is not the *motive* of the [employee], but the nature of the communication that determines whether it is covered [as a protected act under Labor Code section 1102.5]." (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 852 (*Mize-Kurzman*).)

Here, plaintiff identifies the following communications as protected activity:  (1) an October 2011 complaint to a union representative regarding

10

her lack of proper supervision and inadequate supplies and resources (including therapeutic inmate holding cages) with which to perform her job; (2) a 2012 complaint to T.F., a labor relations officer, that another employee, Angel L., yelled at plaintiff, alleged she was insubordinate, and "forced her to violate HIPPA [*sic*] laws" by placing inmate files under the door to another office; (3) a September 2012 complaint to Barbara Brown, an employee relations officer, regarding her lack of proper supervision, inadequate supplies, failure to receive a proper raise, and inappropriate transfer from a mental health unit to a medical health unit; (4) an October 30, 2013 union grievance that she was working out of her job classification without receiving commensurate pay; (5) an April 2014 grievance regarding a dispute over not receiving a salary adjustment and a request for a performance review; (6) a May 22, 2014 email in which plaintiff claimed she had been discriminated against; and (7) a May 29, 2014 email in which plaintiff claimed she did not receive a fair performance evaluation.

These complaints do not reflect any reasonable belief on plaintiff's part that CDCR was engaged in a particular employment practice in violation of FEHA or any other local, state or federal statute, rule or regulation. Instead, her complaints reflect personal grievances with several aspects of her work environment, including a lack of proper supervision and training, inadequate access to supplies and the Internet, and unfair performance evaluations and denials of pay increases. These are not protected activities under FEHA or Labor Code section 1102.5. (*Yanowitz, supra*, 36 Cal.4th at p. 1047; see *Mize-Kurzman, supra*, 202 Cal.App.4th at pp. 852–853 [distinguishing between "the disclosure of policies that plaintiff believed to be unwise, wasteful, gross misconduct or the like . . . and the disclosure of policies that plaintiff reasonably believed violated federal or state statutes, rules, or regulations"];

11

cf. *McVeigh, supra*, 213 Cal.App.4th at p. 471 [prima facie case of retaliation demonstrated where "[plaintiff] did not merely refer the employees he suspected of [fraud] to his superiors for personnel action within Recology. He took his reports to law enforcement, and they were reports of illegal conduct not just 'internal . . . personnel matters' "].) As the California Supreme Court explained: "The tort of wrongful discharge is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1257.)

*Patten* is demonstrative. There, a school principal's disclosures "about needing more staff for safety purposes . . . were made in an exclusively internal administrative context. They do not show any belief on [the principal's] part that she was disclosing a violation of state or federal law in any sort of whistleblowing context . . . ." (*Patten, supra*, 134 Cal.App.4th at p. 1385.) As *Patten* explained, "[t]o exalt these . . . disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected 'whistleblowers' arising from the routine workings and communications of the job site." (*Ibid.*; see *Conn v. Western Placer Unified School Dist.* (2010) 186 Cal.App.4th 1163, 1182 (*Conn*) [affirming directed verdict for defense where the evidence "showed that in making her complaints [plaintiff] was attempting to secure special education services for her own children and certain students in her class" and "there was no evidence 'she was complaining that the District had a persistent and pervasive system of ignoring its special-education students and violating state statutes designed to protect these [vulnerable students]' "].)

As plaintiff notes, two of her complaints refer to conduct that violates FEHA or a federal statute. In 2012, plaintiff complained to a labor relations officer about being forced by a CTC staff member "to violate HIPPA [*sic*] laws" by sliding confidential files under the office door of a colleague, and in a May 22, 2014 email to five colleagues, she expressed being discriminated against "in so many ways." These communications at most reflect plaintiff's generalized concerns that certain coworkers or managers mistreated her at work. However, aside from plaintiff's lone mention of HIPAA in her complaint about a colleague's demand that she slide documents under an office door, there is no evidence in the record that plaintiff had a specific concern that CDCR had a policy or practice of violating this act.[7] (*Conn, supra*, 186 Cal.App.4th at p. 1182.) Similarly, plaintiff's vague reference to "[being] discriminated against" lacks any grounding in a particular discreet event(s) in which she faced discrimination by a supervisor. As such, these communications also fall outside the scope of protected activity under FEHA or Labor Code section 1102.5. (See *Yanowitz, supra*, 36 Cal.4th at p. 1047 ["vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate *will not suffice to establish protected conduct*" (italics added)]; *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1194 ["Absent the identification of some more pointed

---

[7] In the employment discrimination complaint that plaintiff filed with the DFEH in 2015, she stated that several people who were not her immediate supervisor "were giving me different and conflicting directives. Some of these orders were in violation of HIPPA [*sic*] laws since they asked that I send patient files under a door to an office where other employees can view the concealed and protected patient files." However, this posttermination communication does not show that, prior to her termination, plaintiff had a reasonable belief that CDCR had a policy or practice of violating HIPAA and that she complained to CDCR's management about it.

criticism or opposition salient to an act reasonably believed to be prohibited by FEHA, Husman failed to raise a triable issue of fact supporting his claim of retaliation"].)

B.   *Causal Link.*

Even assuming plaintiff engaged in protected activity in her 2012 complaint that another employee forced her "to violate HIPPA [*sic*] laws" and in her May 22, 2014 complaint that she had been discriminated against "in so many ways," plaintiff must also demonstrate a causal link between the activity and her termination, to make a prima facie case of retaliation. (*Patten, supra*, 134 Cal.App.4th at p. 1384.)  Attempting to create a triable issue, plaintiff relies on the temporal proximity between her communications and Deems's November 2012 request for an investigation into her improper phone calls.

" ' "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.' " [Citation.]' [Citation.]" (*Morgan, supra*, 88 Cal.App.4th at pp. 69–70.) However, " '[e]ssential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.' [Citations.]" (*Id*. at p. 70.)

Here, notwithstanding the timing of plaintiff's complaints, there is no evidence that Deems, the official who made the decisions to investigate then terminate plaintiff, was aware of her complaints.  (*Morgan, supra*, 88 Cal.App.4th at pp. 69–70.)  Deems gave undisputed testimony that he had no knowledge of any of plaintiff's alleged protected activity when terminating

her. Rather, he based his decision entirely on the results of the OIA investigation, which was by all means comprehensive and fair.[8]

Plaintiff speculates that Deems must have known about her complaints and suggests that he was not forthcoming in his declaration or deposition testimony. However, plaintiff presents no actual evidence to refute Deems's clear denials of having such knowledge.[9] Nor does plaintiff present evidence from any of the people to whom she directed her complaints from which it could be inferred that Deems knew of her complaints. As such, plaintiff's speculation does not meet her burden of demonstrating a disputed issue of fact as to whether Deems was aware that she was engaging in protected activity. (See *Kase v. Metalclad Insulation Corp.* (2016) 6 Cal.App.5th 623, 646 [a party cannot avoid summary judgment by " ' " 'asserting facts based on mere speculation and conjecture' " ' "]; *Morgan, supra*, 88 Cal.App.4th at p. 73 ["In the absence of evidence that the individuals who denied appellant employment were aware of his past filing of a grievance, the causal link necessary for a claim of retaliation can not be established"].)

Plaintiff also argues that Deems's ignorance of her complaint-making does not " 'categorically shield [CDCR] from liability' " because " 'other substantial contributors' " to his decisionmaking, mainly her CTC managers and supervisors, had the requisite retaliatory motive, citing *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 109–110. *Reeves* does not

---

[8] It was not until interviewing numerous witnesses and reviewing a wealth of evidence that the OIA found that plaintiff committed serious violations of CDCR rules and policies, including being overfamiliar with an inmate, improperly storing and removing confidential CDCR records, and disobeying orders not to discuss its confidential investigation.

[9] In arguing that "Deems was was [*sic*] familiar with her protected activity," plaintiff cites to "Brown Depo 188:2-10." The cited deposition testimony is not in our record on appeal, and we therefore do not consider it.

help plaintiff, as she presented no evidence that any of the individuals to whom she voiced complaints about being discriminated against or forced to violate HIPAA laws were "substantial contributors" to Deems's decision to terminate her. (See *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1251 [distinguishing *Reeves* where the plaintiff presented "no evidence that any of the coworkers to whom he spoke about 'why [he] was sick' was a 'substantial contributor' to the decision to discharge him"].) On the contrary, the record reflects that chief nursing executive Laureano first reported in 2012 plaintiff's alleged misconduct to Deems, who then directed the OIA to independently investigate the allegations. Plaintiff does not claim, much less offer evidence, that Laureano had a retaliatory motive or was somehow in cahoots with any coworker or supervisor who had such motive.

Accordingly, for the reasons stated, we affirm the trial court's finding that plaintiff failed to make a prima facie case of retaliation under FEHA or Labor Code section 1102.5.

## III. Race Discrimination Under FEHA.

Plaintiff's remaining claim is for racial discrimination in violation of FEHA, which requires a prima facie showing "that (1) [s]he was a member of a protected class, (2) [s]he was . . . performing competently in the position [s]he held, (3) [s]he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 (*Guz*).) As before, if an essential element of the plaintiff's prima facie case is negated, the defendant is entitled to summary judgment. (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 170 (*Wills*).) However, if a prima facie case is made, the defendant must present evidence that it had a legitimate, nondiscriminatory justification for the adverse

16

employment action, which then shifts the burden back to the plaintiff "to 'offer substantial evidence that [the defendant's] stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citation.]" (*Wills, supra*, at p. 171.)

Where, as here, the plaintiff relies on allegations of disparate treatment to prove discrimination, he or she must show " 'that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly.' " (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1535.) "Another employee is similarly situated if, among other things, he or she ' "engaged in the same conduct without any mitigating or distinguishing circumstances." ' " (*Wills, supra*, 195 Cal.App.4th at p. 172.)

To show disparate treatment, plaintiff offered evidence that (1) Susan L., a Caucasian, gave a brownie with a candle to an inmate on his birthday; (2) Georgina N., a Latina, was caught sharing makeup with an inmate; (3) Dr. Millford, whose race is unidentified, shared candy with inmates; (4) David W., an African-American male, had a cell phone in his brief case; and (5) unidentified recreational therapists brought movies to prison. According to plaintiff, none of these colleagues was terminated for his or her conduct.

As an initial matter, while plaintiff presented evidence that coworkers were also overfamiliar with inmates, plaintiff presented no evidence that CDCR was aware of any of the coworkers' conduct or, more importantly, that it handled their conduct differently than plaintiff's conduct. Plaintiff

17

disregards the fact that her overfamiliar conduct did not alone lead to her termination. Rather, plaintiff's overfamiliar conduct triggered an independent investigation by the OIA, the fairness of which has not been challenged, that revealed numerous *other acts* of misconduct. There is no evidence of any comparable procedure or findings with respect to the conduct of the allegedly similarly situated employees.

As the trial court found, "plaintiff's cumulative incidents of misconduct are not remotely comparable to that of the other persons she cites in her examples . . . ." To state the obvious, giving food to an inmate, sharing makeup with an inmate or having a cell phone in a personal briefcase is a far less serious act than plaintiff's combined acts of (among other things) improperly calling an inmate's attorney and mother and lying about it; improperly storing confidential inmate patient files and, in some cases, taking the files home and refusing to return them; and disobeying repeated commands not to discuss her case while the confidential investigation was pending.

Accordingly, we conclude plaintiff failed to present evidence showing that CDCR treated similarly situated employees more favorably, or any other evidence "supporting a rational inference that intentional discrimination, on grounds prohibited by the statute, was the true cause of [CDCR's] actions." (*Guz, supra*, 24 Cal.4th at p. 361, italics omitted.) Summary judgment in CDCR's favor was thus appropriate. (*Ibid*.; see *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1113.)

## DISPOSITION

The judgment is affirmed.

_____
Jackson, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A158715/*Brown v. Dept. of Corrections & Rehabilitation*

19